CHICAGO & A. RY. CO. v. UNITED STATES. FAITHORN v. SAME. WANN v. SAME.

(Circuit Court of Appeals, Seventh Circuit. April 16, 1907.) On Rehearing, October 9, 1907.)

Nos. 1,303–1,305.

CARRIERS—INTERSTATE COMMERCE—PAYMENT OF REBATES.

Private tracks built by the owner of a packing plant on its own property, extending from a connection with the tracks of a belt line railroad company to and around its buildings, and used in loading cars for shipment, are not a part of the railroad system, but plant facilities, and the refunding by a railroad company, which made and published a schedule of through rates, including the belt line charge, of $1 per car to such packing company on shipments made by it and paid for at the schedule rate, on the ground that it was a payment for the use of such private tracks, thus making the rate charged $1 per car less than that published and charged to shippers generally from the same point, constituted the giving of a rebate, in violation of section 1 of Elkins Act February 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880].

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

For opinion below, see 148 Fed. 646.

Ralph M. Shaw, for plaintiffs in error.
F. G. Hanchett, for the United States.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge. Plaintiffs in error were jointly convicted of violating that part of section 1 of the Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847) which inhibits the giving of "any rebate * * * in respect of the transportation of any property in interstate or foreign commerce * * * whereby any such property shall by any device whatever be transported at a less rate than that published and filed." U. S. Comp. St. Supp. 1907, p. 880.

The government proved that the Chicago & Alton was an interstate common carrier, having a line extending eastward from Kansas City, Mo.; that the Kansas City Railway Company was an interstate common carrier between Kansas City, Kan., and Kansas City, Mo., having a belt line over which it hauled cars of freight from industries along its tracks to various railroads; that the Schwarzschild & Sulzberger Company, a corporation, owned and operated a meat packing plant at Kansas City, Kan., adjoining the tracks of the Belt Line; that the S. & S. Co. was not a common carrier; that within its plant, and running around and between various buildings thereof, the S. & S. Co. at a cost of $75,000 built about a mile and a half of tracks, switches, and sidings, on which the annual outlay for maintenance and taxes was $1,200; that the S. & S. tracks connected with the Belt Line tracks at the property line; that the Alton had arrangements with the Belt Line and with eastern railroads whereby the Alton undertook to transport property in interstate commerce from Kansas City, Kan., to seaboard cities; that the Alton published and filed schedules of rates for such transportation; that the Belt Line published and filed a rate of $3 a car for hauling cars of freight over its line from the S. & S. plant to the Alton; that the Alton transported various car loads of freight for the S. & S. Co. from Kansas City, Kan., to eastern points, collected from the S. & S. Co. the full amount of the published rates, and paid to the Belt Line $3 a car, which amount was included in the Alton's published rates; and that the Alton, through plaintiffs in error Faithorn as vice president, and Wann as general freight agent, paid back to the S. & S. Co., under book entries of "refund of terminal charges," $1 on each car for the use made of the S. & S. tracks in getting the S. & S. Co.'s cars of freight out upon the Belt Line's tracks.

At the conclusion of the government's evidence, plaintiffs in error moved that the jury be directed to return a verdict of not guilty. This motion was overruled. Thereupon plaintiffs in error offered to prove that the use of the S. & S. tracks was reasonably worth $1 a car. The court excluded the proffered evidence.

These adverse rulings present but a single question. If the fact that the S. & S. Co.'s charge for the use of its tracks was reasonable would take the case out from under the statute, the burden would lie upon the government, in order to bring the case within the statute, to prove that the charge was unreasonable; and this the government did not attempt to do. So the assignments of error center on the challenge of the sufficiency of the government's evidence to sustain the verdict of guilty.

Some discussion in briefs and in oral argument was had over the fact that the arrangement between the Alton and the S. & S. Co. was not published and filed with the Interstate Commerce Commission.

The S. & S. Co. was not a common carrier, and therefore had nothing in the way of rates and charges to publish and file with the commission. Shippers, of course, were interested to learn from the Alton's published schedules not only the rates between different points, but also the terminal charges, if any, that were to be exacted of them in addition to the rates. We think it is clear that the shipping public were not concerned in what part of an Alton through rate was paid by the Alton to the New York Central or to any owner of tracks that were used in making the through shipment. But if divisions of rates or track rentals were required to be published, we think it is equally clear that a failure to publish could not make a rebate of what is not a rebate, and, on the other hand, that publication could not save what is a rebate from being found to be a rebate. So the aforesaid matter of publication has nothing to do with the case.

Payment by the Alton to the S. & S. Co. was in the guise of a "refund of terminal charges," as though the Alton through oversight had collected more than the lawful charges and was rectifying the mistake. But as courts rightly are keen to penetrate an innocent appearing device to reach an illegal transaction, they should also be alert to save a lawful act though it be hid under a false cover. These plaintiffs in error should not be punished for methods of bookkeeping if the false entries represented in fact a lawful arrangement.

The real transaction was the payment by the Alton for the use of the S. & S. tracks in getting S. & S. freight out of the plant to the Belt Line. The consideration was not based on a fixed monthly or yearly rental, or on a percentage of the investment, but was determined by the amount of use measured by wheelage. But rentals on the basis of wheelage are unobjectionable if the parties have entered into a contract which in all other respects is lawful.

This contract was made on the Alton's part through its traffic department. We may know as a matter of common information that contracts respecting right of way, roadbed, and track are usually made through the engineering or maintenance of ways department, and not through freight agents. But, again, these plaintiffs in error should not be punished because the rental was measured by wheelage or because the contract was made by freight agents.

S. & S. received back a part of the money they paid the Alton for freight. That fact alone does not prove that the transaction constituted a rebate within the definition of the statute. A railroad may pay its lawful indebtedness to a shipper out of the money the shipper pays it for freight; or a shipper may pay the full freight partially in money and partially in canceled legal demands against the railroad. The statute's definition of a rebate is any device whereby any property in interstate or foreign commerce is transported at a less rate than that published and filed. So if the full rate be paid either in money or in money's worth, the parties cannot be guilty of rebating. Of course, the money's worth part of the payment might itself be used as a device whereby the property would be carried in interstate commerce at less than the published rate; but in this case the presumption must be indulged that the wheelage charge of $1 a car measured the true rental value of the S. & S. tracks.

The foregoing considerations compel us to the conclusion that the judgment cannot be sustained except by holding that the contract between S. & S. Co. and the Alton was illegal and void.

The use that the contract provided for was the use that was made in hauling S. & S. freight from inside of the S. & S. plant out to the S. & S. property line, so that there it might be put on the Belt Line's track, which in these through routings is to be taken as a part of the Alton system. Plaintiffs in error defend the arrangement on the ground that an interstate common carrier has the right to pay a shipper a just allowance for the use of any instrumentality furnished to the carrier by the shipper in connection with the transportation of the shipper's property. And attention is called to the closing paragraph of section 15 of the recent Hepburn Act (Act June 29, 1906, 34 Stat. 590) as being declaratory of the law as it stood when the contract now in question was made:

"If the owner of property transported under this act directly or indirectly renders any service connected with such transportation or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable."

It never has been unlawful for a railroad to lease cars from a shipper, like the Armour Company, any more than from a builder of cars, like the Pullman Company. But if cars are leased from a shipper, not only the Hepburn act, but also the Cullom and the Elkins acts, as we regard them, prohibit the extension of favors to the shipper in the way of freight rates under cover of the lease. So, if a railroad in discharging its undertakings as an interstate common carrier may lease tracks from another railroad, we perceive no valid reason for denying a railroad the right to lease tracks from a shipper for a like purpose, provided the rental is fair and does not include, by being excessive, a concession from the established transportation rates. The trouble in this case, however, comes from the fact that the Alton did not take a lease of the S. & S. tracks for the purpose of discharging its undertakings as an interstate common carrier. It had undertaken to carry for all the shipping public a car load of meats from Kansas City, Kan., to New York for $20, say. For that purpose it controlled, by means of its connections, a public highway. The S. & S. tracks were not a part of that highway. They were not used by the Alton in serving the shipping public generally. Their only use was in getting a particular shipper's freight from his own property out to the public highway. Suppose that the S. & S. Co., instead of ties and rails, had put down a paved roadway on its land, and that the Alton, in addition to the $20 worth of transportation it was giving to other shippers, furnished horses and wagons to haul the meats from the packing rooms to the Belt Line, would it be contended that the Alton could lawfully still further pay the S. & S. Co. for the use of the pavement? Or suppose that the S. & S. plant was all under one roof, and that the trolleys which convey carcasses and cuts of meat from one department to another were so arranged that the finished produce arrived at the property line adjoining the Belt tracks, could the Alton properly make an allowance for the use of the trolleys as instrumentalities furnished by the shipper in the transportation of property in interstate commerce? In our

156 F.—36

judgment, the jury were warranted in finding that the tracks in question were plant facilities, as clearly as the supposititious pavement and trolleys would be plant facilities, and not instrumentalities for the Alton's use in discharging its duties to the public. Wherever the Alton needed tracks for that purpose, it could acquire the land by exercising the sovereign power of eminent domain which had been conferred upon it by the people. But manifestly the Alton could not condemn the S. & S. tracks for the sole purpose of hauling the S. & S. Co.'s product from its warehouse to the Alton's public highway, because that would be a private purpose. Whatever property the Alton could condemn it could acquire by deed or lease, but by taking a lease it could not change a private purpose or use into a public one. The lease of these plant facilities was therefore a device whereby the property of the S. & S. Co. was transported at $19 a car, while other shippers were paying $20.

This case is ruled in principle, we believe, by the decision in Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, that an arrangement whereby a particular shipper was allowed to offset against his freight bills the true value of the use of his teams in hauling the property from the railroad to his warehouse was a discrimination against other shippers of the same class of property in the same city who were compelled to pay the freight in full. It is contended that the citation is inapplicable because the question there was of discrimination and here of rebate. Under the Cullom act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), the standard of comparison was the treatment of other shippers. It was necessary to prove not only that the favored shipper really paid less than the published rate, but also that other shippers paid the full rate or a greater rate than that of the favored shipper. Under the Elkins act the standard of comparison is the published rate. It is only necessary to prove that the favored shipper has had his property transported at a less rate than that published and filed. Both acts were aimed to kill favoritism, and the favoritism in the Wight Case was of the same kind and effect as in this. The big manufacturer or dealer has all the advantage over his small competitor that he is legally or morally entitled to in his savings of labor cost and in buying his materials at greater discounts. The application of the maxims of merchandising to railroading was always counter to the common-law pact between the railroads and the people. But it was not until the government as parens patriæ was authorized to represent the scattered and unorganized sufferers from favoritism that any hope appeared of taking the railroad business out of the realm of private barter.

We exclude from the case, as not being within the issues, any question of the right of a railroad to render greater service or to furnish more facilities for one shipper than another for the same published charge. The issue here is the right to furnish the same or more at a less price.

GROSSCUP, Circuit Judge (concurring). I cannot bring myself to the conclusion that until the cars loaded with the products of the S.

& S. Company actually reached the rails of the Terminal Railroad Company, such products were not already in course of interstate transportation—that until the rails of the Terminal Company were reached, neither the shipper nor carrier were subject to the obligations, or entitled to the rights, that shippers and carriers are subject to, and acquire, only when the things to be shipped have reached the stage of being actually in course of interstate transportation. My personal view is that the moment the products of the S. & S. Company passed out of its hands into the cars of the Terminal Company for transportation, whether the cars thus receiving such products were at the time on the rails belonging to the S. & S. Company, or on the rails belonging to the Railroad Company, the interstate transportation of those products had already commenced; and that the published rate is a rate for the whole of that transportation, from the moment it thus begins to the moment the goods reach their destination; from which it follows, it seems to me, that as against the S. & S. Company, notwithstanding the fact that the Railroad Company receives the goods at the S. & S. Company warehouses, and on its rails (no additional terminal charges having been fixed) the Railroad Company could not lawfully exact more than the regular published rates; while in the performance of its obligations to other shippers, under the Interstate Commerce law, it could not lawfully accept less. In other words, under the facts presented, the published rate is not affected by the fact that the cars were loaded at the S. & S. Company's warehouses, and not on the Company's rails—such place of loading being, along with the Railroad Company's freight stations, "Kansas City" within the meaning of the published rates.

Now I am inclined strongly to the judgment that through contract with the parties interested, the Railroad Company could, at its own expense, lawfully have laid its own rails up to and along side of the S. & S. Company's warehouses, notwithstanding the fact that title to the land under the rails should remain in the S. & S. Company; or could have leased the rails laid by the S. & S. Company of that company; provided always that the transaction was not a subterfuge to cover up discriminations. But an arrangement of that kind between the two companies cannot, in my judgment, for reasons of public policy that the Interstate Commerce Act was intended to carry out, be lawfully based on division of rates, or in any other way be connected with, or affect, the rate making function of the Railroad Company; for to secure equality among shippers, the law commands, not only that the rates shall be equal, but that they shall be fixed and certain—subject to no addition or diminution against, or in favor of, any one—so fixed and certain that any shipper can with his head and pencil figure out from the tariff sheets just what the rate is, both for himself and for his competitors; from which it follows that, while the Railroad Company, through its appropriate department, might lawfully perhaps have leased these rails of the S. & S. Company, paying therefor a reasonable rental, it could not lawfully for the reasons of public policy named, through its tariff department, and on the basis of a division of rates (the whole arrangement secret so far as the published

tariff sheets were concerned) have made the arrangement that was offered as a defense to the offense prosecuted.

The judgment is affirmed.

## On Rehearing.

PER CURIAM. The burden of the argument in support of the petition is that the opinion of the court promulgates the doctrine that it is unlawful "for a railroad company to acquire by lease or purchase or other contract the ownership or the right to use a track leading from its right of way to an industrial plant." The facts of the case do not require the affirmance of such a proposition; and we disclaim the inference which counsel draw from the language of the opinion. We do not elaborate because we believe that counsel, on reading the opinion anew, will have no difficulty in understanding that our judgment of the character of the Alton's dominion over the S. & S. tracks was founded on our view that the evidence warranted the jury in finding that "the tracks were S. & S. plant facilities, and not instrumentalities for the Alton's use in discharging its duties to the public."

The petition is overruled.