NOONAN, Circuit Judge:
 

 The Interstate Commerce Commission (the ICC or the Commission) brought suit against Transcon Lines (Transcon) and its trustee in bankruptcy, Leonard Gumport (the Trustee), seeking an injunction against the collection of freight charges in violation of ICC credit regulations or in excess of Transcon’s tariffs filed with the Commission. The district court granted summary judgment to the defendants. The ICC appeals.
 

 The case presents several unusual elements: a challenge by the Trustee to the ICC’s credit regulations as subversive of the traditional “filed rate doctrine”; the Trustee’s repudiation of certain of Trans-con’s own filed tariffs; the assertion by the Trustee of authority to collect from Trans-con’s shippers a very large amount of undercharges. We disagree with the reasoning of the district court on these issues and remand to the district court for entry of an injunction against certain of the Trustee’s collection activities. At the same time we affirm the district court’s denial of an injunction against the Trustee’s collection of overdue freight charges.
 

 BACKGROUND
 

 Transcon was once the twelfth largest motor carrier in the United States, with annual revenues of over $200 million. It engaged in its operations as a common and contract carrier in interstate commerce pursuant to authority issued to it by the ICC. On May 1, 1990 an involuntary bankruptcy petition was filed against it in the United States Bankruptcy Court, Central District of California. On May 21, 1990, Transcon consented to an order for relief under Chapter 11. Leonard Gumport was appointed its trustee. On July 10, 1991, the bankruptcy court converted the proceeding to one under Chapter 7 and on July 17, 1990 appointed Gumport the Chapter 7 trustee.
 

 On August 23, 1990 the Trustee obtained authority from the bankruptcy court to employ a rate auditor, a collection agency, and collection attorneys for the purpose of collecting freight charges due Transcon prior to its bankruptcy petition. With the aid of these auxiliaries, the Trustee began efforts to collect from shippers an estimated $8 million in unpaid freight charges, consisting of both unbilled charges and charges which, though billed, remained uncollected. The Trustee also began efforts to collect
 
 *404
 
 from shippers an estimated $15 million in additional freight charges.
 

 In this suit, filed September 17,1991, the ICC asserted that the Trustee in his collection efforts was seeking to collect charges in excess of the tariffs filed by Transcon with the ICC and in numerous such instances had asserted a loss-of-discount remedy for non-payment or untimely payment of an original freight bill without complying with the ICC’s regulations governing a carrier’s extension of credit and a carrier’s remedies against a shipper who received credit but did not pay at the agreed-upon time. The ICC provided a sampling of such charges, showing,
 
 e.g.,
 
 against Marson Corporation 28 claims by Transcon for shipments between January and April 1990, for which the total originally billed by Transcon was $9,631.09; of which Marson had originally paid $7,307.91; and for which the Trustee now sought to collect not only the balance remaining but $7,772.85 as the loss-of-discount remedy for failure to pay on time.
 

 The Trustee answered the ICC’s complaint on October 8, 1991. The Trustee denied that the ICC had jurisdiction over him in that Transcon was no longer an operating common carrier in interstate commerce. The Trustee further denied that the ICC’s credit regulations were in accordance with the statute authorizing such regulations, 49 U.S.C. § 10743, and went on to offer three “affirmative defenses”, viz. (1) that Transcon’s “entire discount scheme” was “an unlawful secret rebate scheme” that the Trustee could not enforce or be compelled to enforce; (2) that Transcon’s “discount tariffs on file with the Interstate Commerce Commission violated the ‘anti-credit’ statutes set forth at 49 U.S.C. § 10743”; and (3) that the ICC’s credit regulations violated “the filed rate doctrine as set forth in the case of
 
 Maislin Industries v. Primary Steel,
 
 497 U.S. [116] 110 S.Ct. 2759, 111 L.Ed.2d, 94 (1990).”
 

 That Transcon filed with the ICC a variety of rates is undisputed. One rate was derived from a combination of “the class rate” and “the bureau tariff.” The class rate came from the National Motor Freight Classification, filed with the ICC on behalf of Transcon and other carriers by the National Motor Freight Traffic Association, Inc. In this gigantic compilation of shippable goods, a class was assigned to every shippable object in terms of its weight, shape and other characteristics affecting transportability. “Bureau tariffs” were also filed by agents for various collectivities of carriers,
 
 e.g.,
 
 the Rocky Mountain Tariff Bureau. The bureau tariff determines the cost of movement by carrier between any two points in the United States for the goods classified under the National Motor Freight Classification. This freight charge, commonly referred to as “the bureau rate”, was on file with the ICC on behalf of Transcon as it was on file for other common carriers.
 

 Transcon also filed with the ICC a “rules tariff”. This tariff specified, in relevant part, that discounts “shall apply only when tariff charges are paid within 90 calendar days from the date of shipment.” This document added that it “simply established] a condition precedent,”
 
 i.e.,
 
 timely payment, for a discount to be given.
 

 Transcon did, in fact, give discounts to shippers. These discounts, too, were filed with the ICC in a tariff labelled TCON 625. Ninety percent of all discounts given by Transcon were given under TCON 625. In over 98% of the discounts given under TCON 625 the shipper was identified only by a code number. Transcon kept an index to the code for its own use. The index was neither filed with the ICC nor open to the public.
 

 STATUTES, REGULATIONS, AND POLICY
 

 The most relevant statutes, set out in 49 U.S.C. are these:
 

 § 10743. Payment of rates
 

 (a) Except as provided in subsection (b) of this section, a common carrier (except a pipeline or sleeping car carrier) providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under this subtitle shall give up possession at destination of property transported by it only when
 
 *405
 
 payment for the transportation or service is made.
 

 (b)(1) Under regulations of the Commission governing the payment for transportation and service and preventing discrimination, those carriers may give up possession at destination of property transported by them before payment for the transportation or service....
 

 § 10761. Transportation prohibited without tariff
 

 (a) Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device....
 

 § 11702. Enforcement by the Interstate Commerce Commission
 

 (a) The Interstate Commerce Commission may bring a civil action— ...
 

 (4) to enforce this subtitle (except a civil action under a provision of this subtitle governing the reasonableness and discriminatory character of rates), or a regulation or order of the Commission or a certificate or permit issued under this subtitle when violated by a motor carrier or broker providing transportation subject to the jurisdiction of the Commission under subchap-ter II of chapter 105 of this title or by a foreign motor carrier or foreign motor private carrier providing transportation under a certificate of registration issued under section 10530 of this title;
 

 The relevant regulations issued by the ICC under 49 U.S.C. § 10743 are set out in 49 C.F.R. § 1320 as amended through July 24, 1989)
 
 [1]
 

 
 *406
 
 The relation of many of these regulations to bankruptcy was made evident in a memorandum issued by the ICC on October 9, 1991 on “enforcement policy” to its Office of Compliance and Consumer Assistance— Enforcement Staff (OCCA). The memorandum, after reviewing the beneficial effects of the policy guidelines issued by the ICC in 1988, declared:
 

 Other parts of the guidelines have not worked as well. Departure from the filed tariff has been treated as a rebate
 
 *407
 
 or concession which was excluded from the high emphasis enforcement list. However, in the partially deregulated and highly competitive environment of the 1980’s, numerous carriers failed to file tariffs reflecting agreed to reduced rates. The subsequent bankruptcy of some of these carriers, and the ensuing efforts of zealous auditors to find any additional monies that might be collected on behalf of those carriers’ estates, resulted in a flood of civil actions to collect undercharges from shippers. The Commission’s first attempt to deal with this problem (by declaring these carriers’ actions an unreasonable practice that would bar collection of the filed rate) was rejected by the Supreme Court.
 

 The widespread bombarding of shippers with undercharge claims has created instability and confusion. In light of this development, it is important that motor carriers and the shipping public continue to be sensitive to the requirement for common carriers to file their rates and adhere to them. Accordingly, tariff filing requirements are worthy of increased attention and cannot be relegated to a low emphasis category. OCCA will consider enforcement action where feasible against carriers who fail to assess and collect filed rates and shippers who knowingly receive such concessions and rebates. Factors to be taken into consideration include whether the number and size of the balance due bills would affect prosecutive merit, whether the nature of the tariff departures make pursuit of the violations appropriate, whether the carrier is in bankruptcy, whether there are pending related Commission proceedings, whether there is a willingness on the part of the carrier to discontinue the unlawful practice and make refunds and whether the enforcement action will be cost effective. The foregoing are merely guidelines which OCCA may follow.
 

 PROCEEDINGS
 

 Conceding that no material facts were in dispute, each party moved for summary judgment. The district court held a hearing on the morning of November 25, 1991. After argument, the district court denied the ICC’s motion for summary judgment and granted the Trustee’s and Transcon’s cross-motion for summary judgment. In open court in explanation of its judgment the district court gave two reasons: First, the ICC credit regulations conflicted with the filed rate of Transcon.
 
 Maislin,
 
 497 U.S. 116, 110 S.Ct. 2759, held that an ICC policy could not permit departure from the filed rate; neither, the district court reasoned, could ICC regulations. Second, the failure of the filed discount rate to disclose the name of the customer being given the rate made the filed discount rates illegal; they violated the requirement, read into the statute by
 
 United States v. Chicago and A. Ry. Co.,
 
 148 F. 646,
 
 aff'd on other grounds
 
 156 F. 558 (7th Cir.1907),
 
 aff'd per curiam,
 
 212 U.S. 563, 29 S.Ct. 689, 53 L.Ed. 653 (1909), that the customer be identified in the filing.
 

 The district court denied the ICC’s motion for reconsideration.
 

 The ICC appeals, joined by the United States pursuant to 28 U.S.C. § 517.
 

 ANALYSIS
 

 Jurisdiction.
 
 The Trustee has not argued to this court the position he adopted in his answer to the ICC’s complaint. Jurisdiction is not now contested. The Trustee stands in the shoes of a motor carrier regulated by the ICC. It would defeat the purpose of the regulatory scheme to hold that bankruptcy ended the ICC’s enforcement powers over the carrier. We hold that the ICC is authorized by the statute to bring a civil action of enforcement against the carrier’s estate, 49 U.S.C. § 11702, and accordingly we have jurisdiction to hear this suit. 28 U.S.C. § 1291.
 

 The Filed Rate Doctrine.
 
 The starting point is the statute governing what regulated carriers must charge, 49 U.S.C. § 10761, a statute that must be read in terms of the several decisions of the Supreme Court insisting on its mandatory character and its central role in the regulation of interstate carriers. The statute, set
 
 *408
 
 out in greater fullness above, provides that a regulated carrier shall provide transportation or service “only if the rate for the transportation or service is contained in a tariff that is in effect under the subchap-ter. That carrier may not receive or charge a different compensation for that transportation or service than the rate specified in the tariff_” As the Supreme Court construed the statute over 75 years ago: “under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext.”
 
 Louisville & Nashville R. Co. v. Maxwell,
 
 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Compliance with the requirement has been found to be “utterly central” to the administration of the Interstate Commerce Act.
 
 Maislin,
 
 497 U.S. at 132, 110 S.Ct. at 2769.
 

 An exception is written into § 10761 itself for what is “otherwise provided in this subchapter.” What is otherwise provided by separate statutory provisions are that the rates may not be unreasonably discriminatory, 49 U.S.C. § 10741; must be reasonable, 49 U.S.C. § 10701; and may be on credit under regulations issued by the ICC, 49 U.S.C. § 10743. The ICC also has the initial responsibility of determining if a rate is unreasonably discriminatory or unreasonable, or if “the practice” of a carrier, as distinct from a rate, is unreasonable, 49 U.S.C. § 10704(b)(1). The interplay of the last statute with the filed rate doctrine was at issue in
 
 Maislin,
 
 which reaffirmed the primacy of the filed rate doctrine.
 
 Id.
 
 497 U.S. at 129, 110 S.Ct. at 2768.
 

 What led to
 
 Maislin
 
 was that the ICC had interpreted the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793, to justify a substantial departure from the filed rate doctrine. The Motor Carrier Act deregulated interstate trucking in many ways.
 
 Maislin
 
 at 122, 110 S.Ct. at 2764. The ICC concluded that negotiated rates between a carrier and a shipper were now permissible even though the negotiated rate was not filed with the Commission. The negotiated rate was always lower than the filed rate — the negotiated rate was intended to meet competition. As long as the carrier stayed in business, no one objected; a carrier would not offend its customers by reneging on the deal. But when a carrier went out of business and a trustee in bankruptcy replaced it, the situation changed radically. The trustee was interested only in collecting the maximum amount legally possible; the trustee was not constrained by the desire to preserve the confidence of the carrier’s customers. The trustee was in the position to denounce the negotiated, unfiled rate as illegal and to insist on the payment of the higher filed tariff.
 

 Such was the case in
 
 Maislin.
 
 From 1981 to 1983 a carrier had negotiated rates with shippers that were below its filed rates; the negotiated rates were never filed; the carrier entered bankruptcy; the trustee sought to recover from over one thousand shippers the undercharges, i.e., the difference between the filed rates and the negotiated rates. One shipper, who was sued for $187,923.26 of undercharges, defended by claiming that the carrier’s practice of seeking the full amount was unreasonable and that the filed tariff was unreasonable. The district court referred these issues to the Commission, which held that the trustee’s attempted collection was' an unreasonable practice inasmuch as the shipper had in good faith relied on the negotiated rate. Back in the district court, the ICC’s ruling was given effect, and the Eighth Circuit affirmed, holding that there was no provision in the Interstate Commerce Act “elevating” the filed rate requirement over the requirement of reasonableness. 879 F.2d 400, 405 (1989). The Supreme Court reversed, adhering to the primacy of the filed rate doctrine.
 
 Maislin,
 
 497 U.S. at 130, 110 S.Ct. at 2768.
 

 In the course of reaching this conclusion, the Court rejected arguments that would have led to the opposite result and were vigorously pressed by the dissent. First, it was argued that the ICC was the agency charged with the administration of the Interstate Commerce Act and with its harmonious interpretation as a whole; deference was due its interpretation.
 
 Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.,
 
 467 U.S. 837, 843, 104 S.Ct.
 
 *409
 
 2778, 2782, 81 L.Ed.2d 694 (1984). Second, it was argued that the filed rate requirement was a vestige of an earlier era where policing of the vast power of the railroads was the thrust of the regulatory scheme; the Motor Carrier Act of 1980 had changed all that as far as trucking was concerned; vigorous competition among the carriers was now to be encouraged. Third, it was contended that the only beneficiaries of the Court’s rigid insistence on the old requirement would be the bankruptcy bar and the unsecured creditors of bankrupt carriers, to say the least a strange policy result and contrary to the usual consideration given to equity in the administration of a bankruptcy-
 

 The Court was adamant. The statute as construed by the Court put the filed rate requirement first. The agency’s ruling could not stand if it derogated from the filed tariff. If deregulation and competition were to have complete sway it was for Congress not the ICC or the courts to repeal the old law, so often construed and enforced by the Court. If a windfall was given to unexpected recipients — so at least the Court implied — it was not the Court’s business. Long ago it had determined that shippers were not entitled to equitable defenses against the filed rate.
 
 Texas & Pacific R. Co. v. Mugg,
 
 202 U.S. 242, 26 S.Ct. 628, 60 L.Ed. 1011 (1906). “Despite the harsh effects of the filed rate doctrine, we have consistently adhered to it.”
 
 Maislin,
 
 497 U.S. at 128, 110 S.Ct. at 2767. The special equitable considerations governing bankruptcy (e.g., He who seeks equity must do equity) were not mentioned but inferentially, as
 
 Maislin
 
 was a bankruptcy case, these equities, too, were subordinated to the filing requirement. In a triumph of doctrinal consistency, the filed rate doctrine ruled the roost.
 

 Transcon’s Filed Rate.
 
 As already described, Transcon had on file with the ICC the bureau rate setting out its full charges; its discount rate; and the rules tariff providing that the discounts applied to charges that were paid within 90 days of the date of shipment. Together these filings constituted Transcon’s filed rate. None of the filed rates incorporated all the conditions set by the ICC for the extension of credit.
 

 The application of Transcon’s filed rate leads (1) to the grant of discounts subject to a condition; (2) to the loss of the discounts when the condition is not met, i.e., payment is not made in 90 days; with the result (3) that the bureau rate governs.
 

 The Impact of the ICC’s Credit Regulations.
 
 The regulations, the ICC responds, are being ignored. Under the statute, § 10743, credit can be extended by a carrier only if it complies with the regulations. Transcon and the Trustee have not complied with a number of regulations, to wit (1) that the original bill to the shipper carry a notice of the penalty for late payment, 49 C.F.R. 1320.3(c); (2) that such penalty be applied “only to the non-payment of original, separate, and independent freight bills and shall not apply to aggregate ‘balance-due’ claims sought for collection on past shipments by a bankruptcy trustee, or any other person or agent.”
 
 Id.
 
 1320.2(g)(2)(iii); and (3) new bills asserting the penalty must be issued “within 90 days of the expiration of the authorized credit period.”
 
 Id.
 
 1320.-2(g)(2)(vi).
 

 Transcon did not comply with the regulation requiring the notice in the original bill, and it is too late for the Trustee to remedy this omission. The Trustee has not complied with the regulations requiring new, individual, non-aggregated bills, and he would find it difficult or impossible to do so. As the regulations have not been complied with, so the Commission contends, the Trustee cannot collect the bureau rate.
 

 The ICC’s position depends on one further proposition: that the difference between the discount rate and the bureau rate constitutes the “liquidated damages” that the carrier may collect when the shipper-on-credit does not pay on time. 49 C.F.R. § 1320.2(g)(1)(h). In the terms used by this regulation, “collection expense charges” are what a carrier collects when the shipper is assessed for overdue freight charges and the difference between the discount and nondiscount rate constitutes the carrier’s liquidated damages for this expense. It is the ICC's position that the
 
 *410
 
 only authority the carrier has for collecting these liquidated damages is obtained by complying exactly with the preceding ICC regulations on credit.
 

 We need not in this case determine the validity of the ICC credit regulations. We need not, for example, determine whether the difference between discounted and bureau rates can so neatly be turned into liquidated damages; nor need we explore the absence of any reference in the regulations to interest or the meaning of “service charges” which the same set of regulations apparently uses in distinction to “collection charges,”
 
 see id.
 
 § 1320.2(e). On such questions, it may well be that deference should be given, as
 
 Chevron
 
 requires, to the agency’s expertise. We also do not question that, in general, the ICC has power to enforce its credit regulations by seeking an injunction. 49 U.S.C. § 11702(a)(4) and (a)(6). The ICC has broad powers to shape remedies for the violation of its rules.
 
 I.C.C. v. American Trucking Assns. Inc.,
 
 467 U.S. 354, 355, 104 S.Ct. 2458, 2459, 81 L.Ed.2d 282 (1984).
 

 The case, however, is different when the ICC seeks an injunction applying its regulations in such a way as to undercut the filed rate requirement. Then
 
 Mais-lin
 
 governs. Regulations, however valid in other contexts, cannot furnish the reason for letting the carrier abandon the filed rate. The ICC’s interpretation of these regulations to allow such a result then has no greater force than the policy rejected in
 
 Maislin.
 
 Although the Act authorizes the ICC to regulate carrier credit, the filed rate doctrine trumps the manner in which the ICC seeks to regulate carrier credit in this case, just as in
 
 Maislin
 
 it trumped the policy the ICC had adopted pursuant its statutory authority to determine the reasonableness of a practice. The filed rate requirement, as
 
 Maislin
 
 holds, is controlling.
 

 As
 
 Maislin
 
 points out, “past experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes”, so as to give lower rates to favored shippers, “while other shippers, less fortunate in their relations with carriers ... would be compelled to pay the higher published rates.”
 
 Maislin,
 
 497 U.S. at 128, 110 S.Ct. at 2766-77 (quoting
 
 Poor v. Chicago, B & Q.R. Co.,
 
 12 I.C.C. 418, 421
 
 Grain Co.
 
 (1907)). Here, the ICC seeks to enforce its regulations in a way that essentially encourages and endorses such methods of circumventing the filed rate requirement, for it would prevent the Trustee from collecting the bureau rate in accordance with all of its filed tariffs. If allowed to enforce its regulations in this way, “the ICC [would permit] the very price discrimination the Act by its terms seeks to prevent.”
 
 Maislin,
 
 497 U.S. at 130, 110 S.Ct. at 2768.
 

 The Commission’s reliance on
 
 Delta Traffic Service, Inc. v. ADM,
 
 954 F.2d 721 (5th Cir.1992), and
 
 Delta Traffic Service, Inc. v. Mennen Co.,
 
 919 F.2d 134 (3d Cir.1990), is misplaced. First, both opinions are unpublished, although the district court opinion in the Third Circuit case is published.
 
 See Delta Traffic Service, Inc. v. Mennen Co.,
 
 730 F.Supp. 1309 (D.N.J.1990). Second, both involved loss-of-discount provisions adopted by carriers at a time when ICC regulations did not permit such provisions. Transcon’s loss-of-discount provision, in contrast, was adopted after the 1988 amendment to the ICC regulations that specifically authorized such provisions.
 

 Going by the filed rate as we must, there is a single filed tariff governing here: the rules tariff providing that the discount lasts only for 90 days after the date of shipment and that timely payment is a precondition of the discount.
 

 There is no need to go beyond this determination of what the operative tariff is. One or two other points, however, are worth mentioning. In oral argument the ICC maintained that “no one reads the tariffs,” that is why the ICC’s credit regulations required notice by bill. We do not know the accuracy of the ICC’s observation although we are instructed by the Supreme Court that “there are commercial services providing up-to-the-minute details of the carrier’s rate schedule.”
 
 Maislin,
 
 497 U.S. at 132, n. 12, 110 S.Ct. at 2764, n. 12. If a shipper doesn’t read the tariff, would the
 
 *411
 
 shipper read the regulations? It is fair to suppose that any buyer getting a discount subject to a precondition is aware that there is a full rate to be paid if the precondition is not met and it is fair to put upon the buyer the burden of knowing what the precondition is. The equities here are not necessarily with the late-paying shippers. They enjoyed the extension of credit by the carrier while the carrier became insolvent. It is not unfair to make them now contribute to the payment of the carrier’s unsecured creditors. But, under
 
 Maislin,
 
 we need not balance equities. The filed rate is decisive.
 

 Not exactly for the first reason given by the district court, that the credit regulations are “invalid,” do we affirm its judgment, but because the Commission’s regulations cannot be enforced in this way to undercut the filed rate.
 

 The Coded Rates.
 
 We also do not adopt the second reason given by the district court that the coded discount rates were invalid because publication of the customer names was required. If that reason held, the vast majority of Transcon discount rates, being coded, would be unlawful, and the Trustee could believe he could collect the bureau rate as the only filed rate that was lawful. In invalidating the coded discount rates, the district court drew no conclusions as to what the Trustee was free to do beyond denying the ICC the injunction it sought. The Trustee, however, has interpreted the invalidation of the coded rates as the equivalent of a declaration that the only rate in effect was the bureau rate. Following the district court’s decision, the Trustee informed shippers who had already paid in timely fashion the original amount billed that “the discount you were granted was and is invalid,” adding that the full amount must now be paid.
 

 We must admit to being troubled by the ICC’s policy of allowing codes alone to identify shippers. Such a practice leads to secrecy, and secrecy makes possible discrimination in rate-setting. Yet we cannot agree with the district court’s decision to address the validity of the scheme because Transcon, as a carrier, lacks standing to challenge the lawfulness its own rates, for two reasons: (1) a carrier cannot obtain reparations from a shipper for undercharges; (2) a carrier’s interests are not within the zone of interests protected by the Act. These reasons are more fully elaborated below.
 

 (1) In the jargon surrounding the Act, a “legal” rate is the
 
 filed
 
 rate.
 
 See Maislin,
 
 497 U.S. at 128, 110 S.Ct. at 2767 (“the filed rate is the
 
 legal
 
 rate”). But a rate is not immune from challenge simply because it is filed; that rate must also comport with the other provisions of the Act. Any challenge to a filed rate is a challenge to its “lawfulness”.
 
 See Maislin, id.; Arizona Grocery v. Atchison Ry.,
 
 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932);
 
 Chicago, M., St. P. & R. Co. v. Alouette Peat Products,
 
 253 F.2d 449, 455 n. 5 (9th Cir.1957);
 
 Southern Pacific Transp. Co. v. San Antonio, Tex.,
 
 748 F.2d 266, 273-74 (5th Cir.1984). In the technical language of the Act, an attack on the “legality” of a rate means an allegation that the rate is not a
 
 filed
 
 rate. As
 
 Mais-lin
 
 proves, a carrier has standing to challenge the legality of its own rates.
 

 But it is another matter for a carrier to challenge the lawfulness of its own filed rates. A court has no power to declare a filed rate unlawful and award damages to a carrier for the past application of the rate by the carrier. A shipper may pay the filed rate, sue because the rate was unlawful, and recover reparations.
 
 Maislin,
 
 497 U.S. at 128, 110 S.Ct. at 2767. No similar right exists for a carrier to recover damages because of its own illegality.
 

 It is established law that “the shipper may receive reparation for overpayment while the carrier can never be made whole after underpayment.”
 
 Burlington Northern, Inc. v. United States,
 
 459 U.S. 131 at 141-142, 103 S.Ct. 514 at 521, 74 L.Ed.2d 311 (1982). The only exception noted by the Court is a provision for a carrier to recover a portion of a rate that was suspended by the Commission but later found to be reasonable, 49 U.S.C. § 10707(d)(2). “[A] carrier may receive reparations
 
 only
 
 when underpayment was the result of the
 
 *412
 
 Commission’s suspension of a tariff.”
 
 Union Pacific R. Co. v. Nevada Power Co.,
 
 950 F.2d 1429, 1434 n. 6 (9th Cir.1991) (emphasis added). This court has no power to grant Transcon reparations for its own unlawfulness.
 

 Under Article III of the Constitution, federal courts may only adjudicate actual “cases” or “controversies”. A “core component” of the federal doctrine of standing is “derived directly” from this constitutional limitation.
 
 Allen v. Wright,
 
 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). One aspect of the “constitutional component of standing doctrine” is that the unlawful conduct complained of by a litigant must appear “likely to be redressed by the requested relief.”
 
 Id.
 
 But no federal court can grant Transcon or the Trustee any effective relief for the unlawfulness they allege. Transcon and the Trustee therefore lack standing to bring a claim alleging the unlawfulness of their own filed rates. Federal courts are “without power to decide questions that cannot affect the rights of litigants in the case before them.”
 
 North Carolina v. Rice,
 
 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1972).
 

 The Bankruptcy Act authorizes the trustee to act on behalf of creditors for the purpose of recovering preferential or fraudulent transfers made by the bankrupt,
 
 see, e.g., In re Leasing Consultants, Inc.,
 
 592 F.2d 103, 110 (2d Cir.1979). No such authorization exists for the trustee to fit “into the overshoes of the bankrupt’s creditors,” 592 F.2d at 110, to challenge rates Transcon has filed in an effort to collect higher rates.
 
 See In re Ozark Restaurant Equip. Co., Inc.,
 
 816 F.2d 1222, 1224-1226 (8th Cir.1987),
 
 cert. denied,
 
 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987).
 

 (2) The doctrine of standing also includes “several judicially self-imposed limits on the exercise of federal jurisdiction”.
 
 Allen,
 
 468 U.S. at 751, 104 S.Ct. at 3324. One of these “prudential” standing limits requires that “the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee.”
 
 Data Processing Service v. Camp,
 
 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The publication requirement of the statute is designed to protect shippers against discrimination and to protect carriers against the competitive disadvantage they may suffer if other carriers discriminate. It is not designed to allow carriers, or their successors in bankruptcy, to repudiate their own filed rates in hopes of collecting a higher rate. Thus, the interest that the Trustee asserts does not fall within the zone of interests that the Act protects.
 
 See, e.g., Churchill Truck Lines, Inc. v. United States,
 
 533 F.2d 411, 416 (8th Cir.1976) (carrier lacked standing to challenge ICC order on environmental grounds).
 

 The Trustee may say, if I can collect the bureau rate on overdue charges, why cannot I collect the bureau rate if the alternative tariff is held illegal? The answer is the filed rate doctrine. When the Trustee collects on the overdue charges, he follows the filed rate,
 
 i.e.,
 
 the rules tariff. When the Trustee seeks to collect the bureau rate in lieu of the allegedly unlawful discount rate, he leaps over the filed rate. He may not do so.
 

 The Trustee seeks to characterize his challenge to Transcon’s rates as one of legality rather than lawfulness — that is, he argues that Transcon’s coded tariffs were not duly filed because neither the Commission nor the public could determine from within the four corners of the tariff the identity of the shipper receiving each coded discount. Without deciding whether the Act requires publication of customers’ names, rather than merely of the rates they receive, we reject this argument. If coded rates are not duly filed and published rates, then Transcon’s rates had not been filed. Without rates on file, the Trustee has no basis for collecting undercharges.
 
 Wonderoast, Inc.
 
 —Petition
 
 for Declaratory Order—
 
 Certain
 
 Rates and Practices of Transportation Systems International, Inc.,
 
 8 I.C.C.2d 272, 278 (1992). We reject the invitation to disaggregate Transcon’s rates, invalidating the discounts and leav
 
 *413
 
 ing the Trustee to collect undercharges on the basis of a truncated filing never meant to stand alone. To permit such a process would be to stand the Interstate Commerce Act on its head and give federal courts an authority over rates that has never been conceded by a statutory scheme where “court-ordered relief interferes with the delicate balance the Act strikes between the competing interests of shipper and carrier.”
 
 Burlington Northern,
 
 459 U.S. at 140, 103 S.Ct. at 521. It is the Commission which has discretion to craft appropriate remedies when the rates on file with it do not themselves comport with the law.
 
 Maislin,
 
 497 U.S. at 133, 110 S.Ct. at 2769
 
 (citing ICC v. American Trucking Assns., Inc.,
 
 467 U.S. 354, 364-65, 104 S.Ct. 2458, 2464-65, 81 L.Ed.2d 282 (1984)).
 

 The Trustee’s Attack On Transcon’s Entire Discount Scheme.
 
 It will be recalled that the Trustee’s first affirmative defense was that Transcon’s “entire discount scheme” was “an unlawful secret rebate scheme.” That contention was not adopted by the district court. The Trustee returns to it in his brief and oral argument on appeal, in effect tying it to his attack on the coded discount tariffs.
 

 The Commission in 1984 ruled that rates could be filed by carriers in terms of individual named shippers and that such rates were not per se unlawfully discriminatory.
 
 Rates for a Named Shipper or Receiver,
 
 367 I.C.C. 959 (1984) (“Named Shipper”). In defense of this ruling the Commission observes that the Interstate Commerce Act does not require that all shippers be treated identically but simply prohibits “unreasonable discrimination”. 49 U.S.C. § 10741(b). The Commission goes on to argue that individual case-by-case examination of alleged discrimination is necessary because “carriers and shippers have unique requirements and opportunities” and there must be competitive injury to a shipper before discrimination is demonstrated.
 

 The Trustee attacks this policy, citing earlier rulings of the Commission,
 
 e.g., California Commercial Ass’n v. Wells Fargo & Co.,
 
 14 I.C.C. 422 (1908) and judicial precedent,
 
 e.g., Arizona Grocery Co. v. Atkinson T. and S.F. Ry. Co.,
 
 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). The Trustee’s basic argument is that a common carrier cannot operate by means of individually negotiated rates. The Trustee’s argument is tied to the issue of the coded rates, because the codes came into use only as the ICC permitted rates with named shippers to be filed in 1984. Prior to this time, there was no point in identifying the shippers as the tariff was general. The secret code, the Trustee contends, is a badge of the secret rebate constituted by the named shipper rate.
 

 The amount at stake if the Trustee’s position should prevail is very large. The ICC estimates it at $1 billion. The Trustee informs us that he intends to sue “several hundred thousand shippers” by May 1992. The deadline is presumably set by the three-year statute of limitations on claims for transportation charges, 49 U.S.C. § 11706(f).
 

 We decline to decide the lawfulness of the individual discount rates for the same reasons that the Trustee’s complaint about the secret code is not relevant to this case. Transcon and the Trustee lack standing to raise this claim. They do not possess the sort of interests the Act was meant to protect and the court, by invalidating the discount rates because they were coded or because they were individual, could afford no remedy to the Trustee. The court lacks power to award the carrier damages retroactively or to circumvent the restriction on its power by striking one filed rate and authorizing the Trustee to collect the rate left standing. No retroactive remedy exists for a carrier that has filed an unlawful rate.
 

 Conclusion.
 
 The district court erred in holding the credit regulations of the ICC invalid and the coded discount rates illegal. The case is REMANDED to the district court for entry of an injunction against the Trustee collecting any amounts on the grounds of the unlawfulness of coded rates or the unlawfulness of individual discount rates. The judgment in favor of the Trust
 
 *961
 
 ee as to collection of the bureau rate on overdue accounts is AFFIRMED.
 

 [1]
 

 . § 1320.1 Scope.
 

 (a)General.
 
 These regulations apply to the extension of credit in the transportation of property under Interstate Commerce Commission regulation by rail, motor, and water carriers and household goods freight forwarders, except as otherwise provided....
 

 § 1320.2 Extension of credit to shippers.
 

 (a)
 
 Authorization to extend credit.
 
 (1) A carrier that meets the requirements in paragraph (a)(2) of this section may—
 

 (i) Relinquish possession of freight in advance of the payment of the tariff charges, and
 

 (ii) Extend credit in the amount of such charges to those who undertake to pay them (such persons are called "shippers” in this part).
 

 (2) For such authorization, the carrier shall take reasonable actions to assure payment of the tariff charges within the credit periods specified—
 

 (i) In this part, or
 

 (ii) In tariff provisions published pursuant to the regulations in paragraph (d) of this section.
 

 (b)
 
 When the credit period begins.
 
 The credit period shall begin on the day following presentation of the freight bill.
 

 (c)
 
 Length of credit period.
 
 Unless a different credit period has been established by tariff publication pursuant to paragraph (d) of this section, the credit period is 15 days. It includes Saturdays, Sundays, and legal holidays.
 

 (d)
 
 Carriers may establish different credit periods in tariff rules.
 
 Carriers may publish tariff rules establishing credit periods different from those in paragraph (c) of this section. Such credit periods shall not be longer than 30 calendar days.
 

 (e)
 
 Service charges.
 
 (1) Service charges shall not apply when credit is extended and payments are made within the standard credit period. The term "standard credit period,” as used in the preceding sentence, means—
 

 (i) The credit period prescribed in paragraph (c) of this section, or
 

 (ii) A substitute credit period published in a tariff rule pursuant to the authorization in paragraph (d) of this section.
 

 (2) Carriers may, by tariff rule, extend credit for an additional time period, subject if they wish to a service charge for that additional time. The combined length of the carrier’s standard credit period (as defined in paragraph (e)(1) of this section) and its additional credit period shall not exceed the 30-day maximum credit period prescribed in paragraph (d) of this section. When such a tariff rule is in effect, shippers may elect to postpone payment until the end of the extended credit period if, in consideration therefor, they include any published service charges when making their payment.
 

 
 *406
 
 (3) Carriers may, by tariff rule, establish service charges for payments made after the expiration of an authorized credit period. Such a rule shall—
 

 (i) Institute such charges on the day following the last day of an authorized credit period, and
 

 (ii) Notify shippers—
 

 (A) That its only purpose is to prevent a shipper who does not pay on time from having free use of funds due to the carrier.
 

 (B) That it does not sanction payment delays, and
 

 (C) That failure to pay within the authorized credit period will, despite this provision for such charges, continue to require the carrier, before again extending credit, to determine in good faith whether the shipper will comply with the credit regulations in the future.
 

 (4) Tariff rules that establish charges pursuant to paragraph (e)(2) or (3) of this section may establish minimum charges.
 

 (f)
 
 Discounts.
 
 Carrier may, by tariff rule, authorize discounts for early freight bill payments when credit is extended.
 

 (g)(1)
 
 Collection expense charges.
 
 Carrier may, by tariff rule, assess reasonable and certain liquidated damages for all costs incurred in the collection of overdue freight charges. Carriers may use one of two methods in their tariffs:
 

 (1) The first method is to assess liquidated damages as a separate additional charge to the unpaid freight bill. In doing so, the tariff rule shall disclose the exact amount of the charges by stating either a dollar or specified percentage amount (or a combination of both) of the unpaid freight bill. The tariff shall further specify the time period (which shall at least allow for the authorized credit period) within which the shipper must pay to avoid such liquidated damages.
 

 (ii) The second method is to require payment of the full, nondiscounted rate instead of the discounted rate otherwise applicable. The difference between the discount and the full rate constitutes a carrier’s liquidated damages for its collection effort. Under this method the tariff shall identify the discount rates that are subject to the condition precedent and which require the shipper to make payment by a date certain. The date certain may not be set to occur by the carrier until at least after the expiration of the carrier’s authorized credit period.
 

 (2) The damages, the timing of their applicability, and the conditions, if any, as provided by the tariff-rule methods allowed under paragraphs (g)(l)(i) and (ii) of this section also: (i) Shall be clearly described in the tariff rule; (ii) Shall be applied without unlawful prejudice and/or unjust discrimination between similarly situated shippers and/or consignees; (iii) Shall be applied only to the non-payment of original, separate and independent freight bills and shall not apply to aggregate "balance-due” claims sought for collection on past shipments by a bankruptcy trustee, or any other person or agent;
 

 (iv) Shall not apply to instances of clear clerical or ministerial error such as non-receipt of a carrier’s freight bill, or shipper’s payment check lost in the mail, or carrier mailing of the freight bill to the wrong address;
 

 (v) Shall not apply in any way to a charge for a transportation service if the carrier’s bill of lading independently provides that the shipper is liable for fees incurred by the carrier in the collection of freight charges on that same transportation service;
 

 (vi) Shall be applied only after the authorized credit period, and when the carrier has issued a revised freight bill or notice of imposition of collection expense charges for late payment within 90 days after expiration of the authorized credit period.
 

 (3)As an alternative to the tariff-rule methods allowed under paragraphs (g)(l)(i) and (ii) of this section, a carrier may, wholly outside of its tariff, assess collection charges though [sic] contract terms in a bill of lading. By using the carrier and its bill of lading, the shipper accepts the bill of lading terms.
 

 (h)Discrimination prohibited.
 
 Tariff rules published pursuant to paragraphs (d), (e), and (f) of this section shall not result in unreasonable discrimination among shippers.
 

 § 1320.3 Presentation of freight bills_
 

 (c)
 
 Bills or accompanying written notices shall state penalties for late payment, credit time limits and service charge and/or collection expense charge and discount terms.
 
 When credit is extended, freight bills or a separate written notice accompanying a freight bill or a separate written notice accompanying a freight bill or a group of freight bill or a group of freight bills presented at one time shall state that "failure timely to pay freight charges may be subject to tariff penalties” (or a statement of similar import). The bills or other notice shall also state the time by which payment must be made and any applicable service charge and/or collection expense charge and discount terms.