The BANKRUPTCY ESTATE OF
UNITED SHIPPING COMPANY,
INC., Appellant,

v.

GENERAL MILLS, INC., Appellees.

United States of America, on behalf of the Interstate Commerce Commission, Intervenor–Appellee.

No. 93–1232.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1993.

Decided Sept. 7, 1994.

Thomas E. Wolff, Eden Prairie, MN, argued, for appellant.

Brent William Primus, Minneapolis, MN, argued (Louis A. Harris and William J. Augello, on the brief), for appellee.

Before McMILLIAN, Circuit Judge, LAY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

The Bankruptcy Estate (Estate) of United Shipping Co. (United), the plaintiff in an adversary proceeding in the bankruptcy court, appeals from a final judgment entered in the District Court for the District of Minnesota[1] that affirmed the order of the bankruptcy court[2] awarding summary judgment in favor of General Mills, Inc. (General Mills). *In re United Shipping Co.,* No. 3–92–0668, 1992 WL 683810 (D.Minn. Dec. 24, 1992), *aff'g* No. 4–88–533 (Bankr.D.Minn. Aug. 27, 1992) (No. ADV 4–89–345). The United States intervened in the appeal on behalf of the Interstate Commerce Commission (Commission or ICC) because Estate challenged the bankruptcy court's decision to give effect to a determination made by the ICC, pursuant to the bankruptcy court's referral, that the transportation relationship between United and General Mills constituted contract carriage. *General Mills, Inc.,* 8 I.C.C.2d 313 (1992) (*General Mills*). For reversal, Estate argues that the district court erred in applying a deferential standard of review and in affirming the decision of the ICC because the ICC failed to follow its own precedents and in effect improperly attempted to retroactively invalidate the applicable regulation, 49 C.F.R. § 1053.1 (1991). Estate also argues the bankruptcy court erred in failing to award prejudgment interest. For the reasons discussed below, we affirm in part and reverse in part and remand the case with directions.

## REGULATORY BACKGROUND

The ICC is an independent regulatory agency charged by Congress to administer

---

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

2. The Honorable Nancy C. Dreher, United States Bankruptcy Judge for the District of Minnesota.

the Interstate Commerce Act (ICA), as amended, 49 U.S.C. § 10101 *et seq.*, including the regulation of interstate motor carrier transportation. To lawfully provide interstate motor carriage, a person must obtain appropriate operating authority from the ICC. *Id.* §§ 10921–10923. The ICC has plenary power to supervise and insure that carriers comply with their licensing permits. *Id.* §§ 10925, 11701(a), 11702(a)(4).

Motor carriers regulated by the ICC can operate as contract carriers as well as common carriers. Common carriage involves services that are held out indiscriminately to all shippers; contract carriage is limited to shippers with which carriers enter into specific agreements or contracts. A carrier may be licensed to provide services in one or both capacities. *Id.* §§ 10102(14), 10923(b). The prohibition against "dual operations," that is, providing both common and contract carriage, was eliminated in 1980. Motor Carrier Act of 1980; Pub.L. No. 96–296, 94 Stat. 793 (repealing 49 U.S.C. § 10930(a)(1)). This case demonstrates the difficulties one encounters in distinguishing contract carriage from common carriage.

■ Motor common carriers must publish and file tariffs with the ICC containing their transportation rates. 49 U.S.C. § 10762; *see e.g., Security Services, Inc. v. K Mart Corp.,* — U.S. —, —, 114 S.Ct. 1702, 1706, 128 L.Ed.2d 433 (1994). The applicable tariff rate (the filed rate) filed by a common carrier is the legal rate and the only rate that the carrier may charge, and that a shipper may pay, for common carriage unless and until that rate is set aside by the ICC as unreasonable or unlawful. 49 U.S.C. § 10761(a); *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 120, 128–29, 110 S.Ct. 2759, 2762–63, 2766–67, 111 L.Ed.2d 94 (1990) (*Maislin*); *ICC v. American Trucking Ass'ns,* 467 U.S. 354, 360 n. 4, 104 S.Ct. 2458, 2462 n. 4, 81 L.Ed.2d 282 (1984) (*American Trucking*); *see also Reiter v. Cooper,* 113 S.Ct. 1213 (1993). The purpose of the filed rate doctrine is to prevent rate discrimination and to promote rate stabilization.

■ Motor contract carriage is exempt from the tariff filing requirement and, there-

fore, the filed rate doctrine does not apply to shipments that move as contract carriage. 49 U.S.C. §§ 10761(b), 10762(f); *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd sub nom. Central & Southern Motor Freight Tariff Ass'n v. United States,* 244 U.S.App.D.C. 226, 757 F.2d 301, *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Yet, like the obligation of a common carrier to adhere to its filed rates, a contract carrier must observe the limits of its operating permit and may not, under its contract permit, provide or unilaterally recharacterize its service as a common carriage. If a contract carrier believes that its operations have crossed over into common carriage, it must test that in a proceeding brought before the ICC and, if necessary, have the ICC modify or revoke its contract carriage permit. 49 U.S.C. § 10925(e); *see Global Van Lines, Inc. v. ICC,* 704 F.2d 829, 833–34 (5th Cir. 1983).

■ Because Congress has given the ICC broad regulatory responsibility over a carrier's contract carriage operations, *ICC v. J–T Transport Co.,* 368 U.S. 81, 88, 82 S.Ct. 204, 209, 7 L.Ed.2d 147 (1961), it is for the ICC to interpret and apply the statutory standards that define contract carriage. *Atlantis Express, Inc. v. Standard Transportation Services, Inc.,* 955 F.2d 529, 532–34 (8th Cir. 1992). The ICA defines a contract carrier as a person providing motor carriage under continuing agreements by either assigning vehicles for the exclusive use of a shipper or providing service designed to meet that shipper's distinct needs. 49 U.S.C. § 10102(15)(B)(ii). At the time of the *General Mills* decision (March 1992), ICC regulations also required that contract carrier agreements be bilateral and in writing, provide for transportation for a particular shipper or shippers, impose specific obligations upon both carrier and shipper or shippers, and cover a series of shipments during a stated period of time in contrast to separate contracts of carriage governing individual shipments. *See* 49 C.F.R. § 1053.1 (1991) (repealed, effective June 20, 1992, in *Contracts for Transportation Property,* Ex Parte No. MC–198 (I.C.C. Mar. 5, 1991, Sept. 11,

1991), 8 I.C.C.2d 520 (1992), *appeal dismissed sub nom. Central States Motor Freight Bureau, Inc. v. United States,* No. 92–1258, 1993 WL 558020 (D.C.Cir. Dec. 28, 1993) (order)).[3]

## BACKGROUND FACTS

General Mills, a national producer and distributor of food products, began using United's common carriage service in 1982. In September 1985, United obtained contract carriage authority from the ICC, and in October 1985 entered into a written agreement with General Mills for transportation service. The agreement provided that: (1) United was a contract carrier desiring to provide service to General Mills in that capacity; (2) General Mills agreed to tender shipments to United for motor transport; (3) United would maintain and operate a sufficient and adequate amount of equipment to furnish service to General Mills according to the contract; and (4) the agreement would continue until either party terminated it by 30 days written notice or if United's contract carrier operating authority was revoked, suspended, or cancelled. Compensation for this transportation was based on rate schedules that were periodically revised and updated as appendices to the agreement.

After the agreement was executed, United cancelled its common carriage tariffs that were applicable to General Mills' traffic, effective November 1985. Between November 1985 and December 1987, General Mills tendered some 3,000 shipments to United, including both customer deliveries and interplant shipments between its flour mills, production plants, and distribution centers. At rates set pursuant to the agreement, General Mills paid United millions of dollars in freight charges.

After initiation of Chapter 11 bankruptcy proceedings by United, Estate brought an adversary proceeding against General Mills to collect roughly $63,000 in undercharges on 695 of the shipments, contending that the shipments moved as common carrier rather than contract carriage and thus were subject to common carrier tariff rates. General Mills contended that the shipments satisfied all statutory and regulatory requirements and properly moved as contract carriage. By stipulation of the parties, the bankruptcy court stayed the adversary proceeding and referred the underlying regulatory issues to the ICC.

## ICC DECISION

Estate did not dispute or refute any of General Mills' allegations of fact or the language of the agreement. Estate argued that (1) the agreement did not meet the "exclusive use" or "distinct needs" tests of 49 U.S.C. § 10102(15) because there were no provisions in the agreement that explicitly addressed either of those requirements, and (2) the agreement did not satisfy the "series of shipments" and "bilateral obligations" requirements of 49 C.F.R. § 1053.1 because it did not require General Mills to tender a particular number of shipments to United. Estate also contended that the agreement failed to provide for a written schedule of rates at all times.

After examining all of the evidence, including the agreement, the parties' subsequent conduct, and all circumstances surrounding this traffic, the ICC found that the shipments moved as contract carriage. 8 I.C.C.2d at 320–25. The ICC found that the agreement provided that the parties intended that the shipments would move under United's contract carriage permit, the agreement would terminate if United's contract authority was revoked, United cancelled its common carriage tariffs that had been previously used in common carriage service for General Mills, and General Mills subsequently tendered thousands of shipments under the contract, which were billed and paid for on a contract basis rather than under common carriage rates. *Id.*

The ICC also found that because United served General Mills' "distinct needs," the transportation provided was consistent with the statutory definition of contract carriage

3. The regulations were reinstated by the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (codified as amended at 49 U.S.C.A. § 10701) (West Supp.1994) (effective Dec. 3, 1993).

under 49 U.S.C. § 10102(15). 8 I.C.C.2d at 323. Finally, the ICC found the agreement was in "substantial compliance" with the requirements of 49 C.F.R. § 1053.1 because (1) the agreement was in writing; (2) it provided for transportation for a particular shipper, General Mills; (3) it was bilateral because General Mills agreed to tender shipments to United and pay for them pursuant to the contract rates, while United agreed to provide service and to keep sufficient equipment available for General Mills' traffic; and (4) it covered a series of shipments rather than a single shipment. 8 I.C.C.2d at 323.

## COURT PROCEEDINGS

The parties returned to the bankruptcy court and filed cross-motions for partial summary judgment to enforce or set aside the decision of the ICC finding that the shipments were contract carriage. (General Mills did not dispute that it owed Estate $1,869.04 for other freight charges.) Applying a deferential standard of review, the bankruptcy court granted the motion for partial summary judgment in favor of General Mills, denied Estate's motion for partial summary judgment and awarded Estate judgment in the amount of $1,869.04, without interest, acknowledged to be due to Estate by General Mills. Estate appealed the decision of the bankruptcy court to the district court. The United States on behalf of the ICC intervened as appellee. The district court also applied a deferential standard of review and affirmed the judgment of the bankruptcy court. This appeal followed.

## STANDARD OF REVIEW

■ As a threshold matter, Estate contends that we should review the ICC's decision *de novo* because we are reviewing a bankruptcy court order. We disagree because, here, we are reviewing neither the legal rulings of the bankruptcy court nor its findings of fact. *In re Apex Oil Co.*, 884 F.2d 343, 348 (8th Cir.1989); *In re Arkansas Communities, Inc.*, 827 F.2d 1219, 1221 (8th Cir.1987). We are reviewing the judgment of a district court affirming a bankruptcy court decision giving effect to a decision of the ICC. In substance, we are reviewing the

decision of an administrative agency. Pursuant to 5 U.S.C. § 706(2), the scope of judicial review of decisions of an agency such as the ICC is very narrow. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43–44, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). Hence, a reviewing court may set aside the ICC's decision only if it is arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with the law or procedure. 5 U.S.C. § 706(2)(A), (D).

■ Under the deferential standard of review, the agency's action is presumed valid so long as the agency has rationally set forth the grounds on which it acted and a reviewing court may not substitute its own judgment. *Sierra Club v. Davies*, 955 F.2d 1188, 1192–93 (8th Cir.1992), *citing Moore v. Custis*, 736 F.2d 1260, 1262 (8th Cir.1984); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). Deference is particularly appropriate when a proceeding involves review of an agency's interpretation of its statutes and regulations. As the Supreme Court explained in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), where Congress has not spoken to the precise issue, or did so ambiguously, a reviewing court cannot substitute its own reading of the statute that an agency is charged with administering, but must defer to the agency's construction so long as its construction was a permissible or reasonable one. *See, e.g., Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.*, 989 F.2d 281, 284 (8th Cir.1993).

We note that the bankruptcy court and the district court applied this deferential standard of review and determined that the decision of the ICC was not arbitrary, capricious, or an abuse of discretion, or contrary to law. Likewise, this court's review must be similarly deferential and, like the district court and the bankruptcy court, we affirm.

■ Estate contends that what is at issue here is simply the interpretation of a contract, and that courts can and do routinely undertake *de novo* review of contracts

without deferring to the views of administrative agencies. We disagree because what is required here is more than contract interpretation; the underlying issue required probing analysis of the transportation relationship between a shipper and a carrier, an analysis which is particularly one within the expertise of the ICC.[4] As the ICC noted in *Commerce Express, Inc.*, No. 40348, 1992 WL 245497, at *2 (I.C.C. Oct. 1, 1992), another case involving United:

> Whether traffic moved as common or contract carriage depends, in part, on the intent of the parties. It is the ongoing relationship, service commitment, and commercial link between a carrier and its shippers that renders contract carriage inherently different from common carriage service alternatives. For example the Commission may look at the circumstances surrounding the particular transportation service to determine whether the shipment at issue moved under a continuing agreement, and whether the transportation involved use of dedicated equipment or a service tailored to meet the distinct needs of the shipper. In any event, it is the totality of the circumstances surrounding any particular movement that determines the character of the carriage.

 Moreover, as noted above, the determination whether a contract carriage or common carriage relationship existed between United and General Mills is a matter within the primary jurisdiction of the ICC. *See, e.g., Atlantis Express, Inc. v. Standard Transportation Services, Inc.*, 955 F.2d at 532–34. Provisions of 49 U.S.C. § 10102(15)(B) that define and distinguish contract or common carriage are at the core of the ICC's regulatory expertise and call into play both the specialized knowledge and authority of the ICC—the agency that Congress has charged with supervising the motor carriage industry—and the need for nationwide uniformity in decision-making that calls for referral to the ICC under the primary jurisdiction doctrine. *United States v. Western Pacific R.R.*, 352 U.S. 59, 63–65, 77 S.Ct. 161, 164–66, 1 L.Ed.2d 126 (1956); *see*

also *Allnet Communication Service, Inc. v. National Exchange Carriers Ass'n*, 296 U.S.App.D.C. 156, 965 F.2d 1118, 1120–22 (1992).

 Deference is particularly appropriate for another reason: Congress did not provide a means by which the courts can determine whether shipments are common or contract carriage. Rather, the ICC provides an express, administrative remedy to deal with questions concerning the nature of the services. If a contract carrier believes that its operations and transportation relationships are for some reason evolving into common carriage, the carrier can seek an evaluation of services in a proceeding before the Commission under 49 U.S.C. § 10925(e)(1). *See Global Van Lines, Inc. v. ICC*, 704 F.2d 829 at 833–34. The availability of the § 10925(e) remedy is consistent with the notion that contract carriage determinations are the ICC's to make, and necessarily heightens the requirement that such decisions be accorded deferential review by the courts. The fact that there is an administrative (rather than a judicial) remedy for contract carriage determinations is consistent with prevailing law that courts have no jurisdiction to entertain civil actions by *common* carriers for undercharges based on unilateral assertions that their applicable filed rates are unlawful. *See, e.g., ICC v. Transcron Lines*, 990 F.2d 1503, 1517 (9th Cir.1992), *vacated and remanded,* —— U.S. ——, 113 S.Ct. 2955, 125 L.Ed.2d 657 (1993) (for further consideration in light of *Reiter v. Cooper,* —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)).

### DISCUSSION

 Estate first argues that the parties negotiated for *common*, not contract, carriage services. We disagree. This position finds no support in the record. The ICC examined unrefuted, factual contentions concerning the agreement, the course of conduct and the transportation relationship between the parties, and concluded that they had transacted business under contract as opposed to common carriage. Both the bank-

---

4. Deferential review is particularly appropriate in the present case because Estate stipulated to the referral to the ICC from the bankruptcy court.

ruptcy court and the district court properly found that the ICC's findings were clearly supported by the record, and not contrary to law, and those rulings will not be disturbed on appeal. *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–21, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Erickson Transport Corp. v. ICC*, 728 F.2d 1057, 1062–63 (8th Cir.1984).

■■■ Estate next argues that, contrary to the ICC's findings, the agreement did not meet the statutory requirements for contract carriage because United neither assigned motor vehicles for the "exclusive use" of General Mills nor provided transportation services designed to meet General Mills' "distinct needs." Estate argues that the "specialized service" United provided General Mills under the agreement with respect to trailer parts, delivery schedules, pallet exchange, electronic data system, insurance, and service reports in fact represented transportation services routinely provided by common carriers. We disagree. United's transportation services for General Mills were performed under a continuing agreement and were tailored to meet the specific requirements of General Mills. This satisfied the distinct needs test. Estate's reliance on *Maislin* is misplaced. *Maislin* did not involve the question of contract or common carriage, but instead whether the ICC could enforce, for certain common carriage transportation, the collection of negotiated but unfiled common carrier rates in lieu of filed tariffs. In upholding the primacy of the filed rate doctrine for common carriage, 497 U.S. at 130, 110 S.Ct. at 2768, the Supreme Court recognized that valid motor contract carriage does not require filed tariffs, *id.* at 133, 135, 110 S.Ct. at 2769, 2770–71, and contract carriage determinations are thus not controlled by *Maislin* and filed rate doctrine considerations.

Here, the unrebutted record reveals that, in order to serve General Mills' distinct needs, United provided a pool of trailers to General Mills for convenient loading and unloading, complied with General Mills' special delivery and rate schedules, participated in a pallet exchange, transmitted freight bills electronically, provided semi-monthly service reports, and provided certain negotiated insurance coverage. The agreement also required United to keep a sufficient supply of adequate equipment to be able to promptly serve and carry all shipments tendered by General Mills and to indemnify General Mills against claims arising from United's conduct under the agreement.

■■■ Estate argues that these services are not "distinct" but are those that common carriers routinely provide. Common carriers do provide these services; however, sometimes they do not. For example, common carriers do not always provide a pool of trailers for particular shippers; to the contrary, it is not unusual for a common carrier to refuse a load because it does not have adequate equipment available. Moreover, a common carrier is not required to provide the types of services that United provided for General Mills in the present case, although it is plainly permitted to do so. Thus, whether or not a common carrier could provide the transportation services that United provided to General Mills is not the issue; the issue is whether, by requiring such service, the actual carriage was tailored to meet a shipper's particular needs in the context of an on-going contractual relationship. *See, e.g., International Detective Service, Inc. v. ICC*, 198 U.S.App.D.C. 334, 613 F.2d 1067, 1074 (1979). The continuing nature of the contractual relationship is particularly important. *See, e.g., ZoneSkip, Inc. v. United Parcel Service, Inc.*, 8 I.C.C.2d 645, 654–55 (1992) (holding fact that the carrier provides substantially identical services to a certain large-volume common carriage shipper as it offers to its contract carriage customers does not threaten the character of its valid contract carriage service), *petition for review denied sub nom. ZoneSkip, Inc. v. United States*, 998 F.2d 1007 (3d Cir.1993) (table).

■■■ Estate next argues the agreement did not comply with the then-applicable regulations for a contract carriage agreement, 49 C.F.R. § 1053.1, and thus cannot be asserted by General Mills as a defense. Estate argues the agreement was not "in writing," not bilateral and failed to cover a "series" of shipments. We disagree.

As a preliminary matter, we note that the regulation was in effect at the time the carriage at issue was conducted. Thus, the ICC correctly applied the regulation to the carriage at issue in the present case. The fact that the regulation was thereafter repealed by the ICC, and later reinstated by Congress, *see* note 3 *supra*, did not affect its application to the carriage at issue and does not constitute an impermissible retroactive repeal of the sort condemned in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

■ The ICC's conclusion that the agreement substantially complied with the regulation is supported by the record: the agreement was in writing; it provided for transportation to a particular shipper; it imposed bilateral obligations on the parties, that is, General Mills agreed to tender shipments and pay for them pursuant to contract rates, and United agreed to provide service and keep sufficient equipment available to handle the shipments; and it adequately identified the shipments covered. Thus, the ICC did not, as Estate argued, "disregard" 49 C.F.R. § 1053.1, but instead expressly followed this court's directive in *Atlantis Express, Inc. v. Standard Transportation Services, Inc.*, 955 F.2d at 534, and applied the regulation in evaluating the character of the transportation relationship at issue. Unlike the shipper in that case, who did not execute a written contract with the carrier but attempted to rely instead on "a continuing oral agreement" to establish contract carriage, *id.* at 533, it was undisputed that United and General Mills entered into a written agreement, thus satisfying the "in writing" requirement of 49 C.F.R. § 1053.1.

■ Estate claims that the agreement fell short of substantial compliance with the regulation because it did not include at all times the rates and charges and all other conditions related to the transportation. The regulation itself does not require that the rates and charges be stated in writing; the ICC eliminated the requirement that contract carriers file their agreements with the Commission as well as the requirement that a statement of charges be included in contract carriage agreements. *See Filing of Contracts by Contract Carriers by Motor Vehicle*, Ex Parte No. MC–9 (Sub–No. 1), 45 Fed.Reg. 58865 (Sept. 5, 1980). In any event, according to the uncontroverted evidence of record, the initial and amended contract rates were established throughout the life of the agreement, either orally or in writing, and incorporated into appendices attached to the agreement. 8 I.C.C.2d at 318, 324.

■ Estate also argues the agreement does not substantially comply with the regulation because it did not include "essential terms" such as the destination of shipments, equipment to be provided, and volume of freight involved. Estate relies upon *MCI Telecommunications Corp. v. E.L. Murphy Trucking Co.*, 1989 Fed.Carr.Cas. (CCH) ¶ 37,748, No. MC–C–30115 (I.C.C. June 22, 1989), and *Diversey Wyandotte Corp.*, 1990 Fed.Carr.Cas. (CCH) ¶ 37,821, No. 40342 (I.C.C. June 4, 1990). Estate's reliance is misplaced. The regulation does not require the inclusion of these terms. Moreover, the ICC has indicated that, to the extent the *MCI* and *Diversey* decisions can be read to require the inclusion of such terms, those decisions should not be followed. *See In re United Shipping Co.*, 134 B.R. 359, 365–66 & n. 7 (Bankr.D.Minn.1991). Moreover, the absence of such terms could make the agreement deficient as a matter of contract law, but would not be controlling for purposes of determining compliance with the regulation.

■ Estate also argues that the agreement was not bilateral because it placed no obligation upon General Mills. We disagree. The agreement required General Mills to tender shipments for transportation by United to multiple points in the United States and to pay for the transportation pursuant to the agreement under a variable rate set in accordance with the distance of the shipments. The agreement also required United to supply adequate equipment to provide prompt and efficient transportation services. We hold that the contract was bilateral. *See id.* at 365 (shipper's promise to tender at least one shipment per year constituted sufficient consideration to support carrier's prom-

ise to carry shipments at negotiated rates and make the contract bilateral).

 Estate also argues the agreement did not substantially comply with the regulation because it did not require any shipments at all and thus failed to cover a "series of shipments." We disagree. We think the agreement was a single contract for multiple shipments over a period of time rather than multiple contracts governing individual shipments. General Mills in fact tendered more than 3,000 shipments to United for transportation over the duration of the agreement.

## PREJUDGMENT INTEREST

 Estate next argues the bankruptcy court abused its discretion in failing to award prejudgment interest on the amount awarded for the undisputed undercharges. The bankruptcy court did not explain its reasons for denying prejudgment interest. Prejudgment interest is normally awarded in claims for undercharges. *See, e.g., Inman Freight Systems, Inc. v. Olin Corp.,* 807 F.2d 117, 121 (8th Cir.1986). We remand the case to the district court for the limited purpose of calculating and awarding prejudgment interest to Estate on the amount of $1,869.04.

In sum, we hold the district court and the bankruptcy court correctly found that the decision of the ICC that the carriage in question was contract, and not common, carriage was not arbitrary or capricious or otherwise not in accordance with the law.

Accordingly, the judgment of the district court is affirmed in part and reversed in part and the case is remanded to the district court for the limited purpose of calculating and awarding prejudgment interest.