89 F.3d 559
 Fed. Carr. Cas. P 84,018, 96 Cal. Daily Op. Serv. 5003,
96 Daily Journal D.A.R. 8071
In re TRANSCON LINES, Debtor.
Leonard L. GUMPORT, Plaintiff-Appellant,
v.
AT & T TECHNOLOGIES, INC., Defendant-Appellee.
Leonard L. GUMPORT, Plaintiff-Appellant,
v.
ACF INDUSTRIES, INC., Defendant-Appellee.
Leonard L. GUMPORT, Plaintiff-Appellant,
v.
A.O. SMITH CORP., Defendant-Appellee.
Leonard L. GUMPORT, Plaintiff-Appellant,
v.
AMERICAN STANDARD, INC., Defendant-Appellee,
Surface Transportation Board,[1]
Defendant-Intervenor/Appellee.
Leonard L. GUMPORT, Plaintiff-Appellant,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant-Appellee.
Leonard L. GUMPORT, Plaintiff-Appellant-Cross-Appellee,
v.
EASTMAN KODAK CO., Defendant-Appellee-Cross-Appellant.
 Nos. 94-55668, 94-55673, 94-55674, 94-56008, 94-56009,
 94-56026 and 94-56027.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 13, 1995.
Decided July 3, 1996.
 
 Joseph L. Steinfeld, Jr., Shawn, Mann & Niedermayer, Washington, DC, for plaintiff-appellant.
 Mary Kay Reynolds, Seider & Reynolds, Los Angeles, CA, for AT&T Technologies, Inc. and A.O. Smith Corporation.
 Mary Kay Reynolds, Seider & Reynolds, Los Angeles, CA, William J. Augello, Augello, Pezold & Hirshmann, Huntington, NY, for ACF Industries, Inc.
 Keith G. O'Brien, Rea, Cross & Auchincloss, Washington, DC, for American Standard, Inc.
 Paul R. Duke (argued), Adam M. Cole, Covington & Burling, Washington, DC, for International Business Machines Corporation.
 Barbara R. Kueppers (argued), Minneapolis, MN, for Eastman-Kodak Company d/b/a Texas Eastman Company.
 Appeals from the United States District Court for the Central District of California, Gary L. Taylor, District Judge, Presiding. D.C. Nos. MISC-29990-GLT, MISC-29991-GLT, MISC-29992-GLT, CV-94-00417-GLT, CV-94-00422-GLT and CV-94-00428-GLT.
 Before SCHROEDER, FERGUSON and O'SCANNLAIN, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 In this bankruptcy proceeding, we must decide whether, under the Interstate Commerce Act, a motor carrier transported shipments as a contract carrier or as a common carrier.
 
 
 2
 * Leonard Gumport, as Chapter 7 Trustee ("Trustee") for debtor Transcon Lines, a motor carrier, appeals the district court's and bankruptcy court's orders upholding the determinations of the Interstate Commerce Commission ("ICC"),[2] which rejected the Trustee's claims under the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10101 et seq., against six of Transcon's former customers who were allegedly undercharged on numerous freight shipments. The Trustee sought to collect interstate motor common carrier freight charges. The ICC determined that the shipments were transported in contract, rather than common, carriage. The Appellees, former shipping customers of Transcon, are ACF Industries, Inc., American Standard, Inc., A.O. Smith Corporation, AT & T Technologies, Inc., Eastman Kodak Company d/b/a Texas Eastman Company, and International Business Machines Corporation (collectively "Shippers"). The ICC intervened on behalf of the Shippers.
 
 
 3
 Chapter 7 debtor Transcon was once the twelfth largest motor carrier in the United States. It engaged in transport as a common and contract carrier in interstate commerce pursuant to authority issued to it by the ICC. The Chapter 7 Trustee for Transcon initiated these proceedings in bankruptcy court against each of the Shippers in order to collect freight undercharges allegedly due on shipments Transcon transported for each Shipper.
 
 
 4
 Relying on provisions of the ICA, 49 U.S.C. §§ 10741(a), 10761-10762, the Trustee seeks to repudiate Agreements that Transcon had with each Shipper for the transportation of shipments at agreed contract prices, and to substitute the higher common carrier rates that Transcon had on file in tariffs at the ICC.
 
 
 5
 The Agreements were entered into between 1985 and 1990. The Trustee claims that the Agreements are "shams" that fail to comply with the statutory and regulatory requirements for contract carriage. The Trustee seeks to recover undercharges totalling more than $60 million from all six Shippers combined.
 
 
 6
 Since the determination of whether shipments constituted contract carriage is a matter within the primary jurisdiction of the ICC,[3] the bankruptcy court referred the cases to the ICC, which rejected the Trustee's claims of undercharges.[4] The ICC found that the shipments moved as contract carriage subject to rates contained in the Agreements between Transcon and each of the Shippers; accordingly, the ICC concluded that the Trustee had no basis to collect from the Shippers the higher amounts contained in Transcon's common carrier tariffs.
 
 
 7
 On return to the bankruptcy court, the Shippers moved for summary judgment based on the ICC decisions and the Trustee moved to set aside the decisions. Deferring to and giving effect to the ICC decisions, the bankruptcy court and then the district court granted summary judgments for each of the Shippers. The Trustee filed timely notices of appeal to this court.
 
 II
 
 8
 Since we are reviewing the judgment of a district court affirming a bankruptcy court decision giving effect to a decision of the ICC, we are effectively reviewing the decision of an administrative agency. See Bankruptcy Estate of United Shipping Company v. General Mills, Inc., 34 F.3d 1383, 1390 (8th Cir.1994) (involving similar appeal and applying agency standard of review). Accordingly, rather than the de novo standard of review for summary judgment, we apply the standard of review for agency decisions. Id.
 
 
 9
 Agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A); Idaho Farm Bureau Federation v. Babbitt, 58 F.3d 1392, 1401 (9th Cir.1995). Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). However, the agency must articulate a rational connection between the facts found and the conclusions made. United States v. Louisiana-Pacific Corp., 967 F.2d 1372, 1376 (9th Cir.1992). This court may reverse under the arbitrary and capricious standard only if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517, 1521 (9th Cir.1995).
 
 
 10
 An agency's fact findings must be upheld if supported by substantial evidence in the record. See Diamond Walnut Growers v. NLRB, 53 F.3d 1085, 1087 (9th Cir.1995). Substantial evidence means more than a mere scintilla but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.1995).
 
 III
 
 11
 As a threshold matter, we address Cross-Appellant Kodak's affirmative defense that the Trustee lacks standing to bring these undercharge actions.
 
 
 12
 Kodak bases its standing argument on this court's analysis in ICC v. Transcon Lines, 990 F.2d 1503 (9th Cir.1992), cert. denied sub nom. Gumport v. ICC, 508 U.S. 981, 113 S.Ct. 2987, 125 L.Ed.2d 683 (1993) (denying Trustee's petition for certiorari).[5] As the bankruptcy court correctly concluded, rather than supporting Kodak's standing challenge, this court's decision in Transcon Lines actually confirms that the Trustee has standing to challenge the Agreements.
 
 
 13
 Although Transcon Lines involves the same Trustee and debtor carrier present here, the case is clearly distinguishable. Unlike here, where the Trustee is suing the Shippers to collect undercharges based on allegedly flawed Agreements for contract carriage, in Transcon Lines, the Trustee challenged the lawfulness of Transcon's filed "coded discount rate" in an effort to collect the higher, filed "bureau rate" for common carriage.[6] Transcon Lines, 990 F.2d at 1515.
 
 
 14
 The court in Transcon Lines held that, under the provisions of the ICA for common carriers, the Trustee lacked standing to challenge the lawfulness of Transcon's filed rates. The court stated:
 
 
 15
 In the technical language of the Act, an attack on the 'legality' of a rate means an allegation that the rate is not a filed rate. As Maislin proves, a carrier has standing to challenge the legality of its own rates.
 
 
 16
 But it is another matter for a carrier to challenge the lawfulness of its own filed rates.
 
 
 17
 Id. at 1515-16. In other words, a carrier's bankruptcy trustee may claim that a given rate was illegal because it was not filed (as the Trustee here claims), but the trustee may not claim that a properly filed rate is unlawful.
 
 
 18
 The court concluded in Transcon Lines that the Trustee lacked standing to challenge Transcon's filed "coded discount rate" in an effort to collect the higher, filed "bureau rate" in common (not contract) carriage because "[a] court has no power to declare a filed rate unlawful and award damages to a carrier for the past application of the rate by the carrier." Id. at 1516. Here, the Trustee is not challenging Transcon's filed rates; quite to the contrary, the Trustee seeks to enforce Transcon's filed rates by challenging the Agreements entered into between the Shippers and Transcon (as a contract carrier), pursuant to which the Shippers paid rates lower than the filed rates.
 
 
 19
 As alluded to by this court in Transcon Lines, id. at 1515, support for the Trustee's standing here can be found in Maislin Industries, U.S. v. Primary Steel, Inc., 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). In Maislin, the parent (Maislin) of a bankrupt subsidiary (a motor carrier, Quinn) sued a shipper (Primary) in district court for undercharges on the ground that Quinn and Primary had illegally negotiated a secret rate that was lower than Quinn's filed rate. Id. at 122-24, 110 S.Ct. at 2764. On referral from the district court, the ICC determined that Maislin was not entitled to recover the filed rates because Maislin's attempt to recover the undercharges was an "unreasonable practice." Id. at 124-25, 110 S.Ct. at 2765.
 
 
 20
 The ICC based this conclusion on its findings that
 
 
 21
 "Primary reasonably believed that the amounts quoted and billed by Quinn were the correct total charges for the transportation services it performed, that the amounts were reached as the result of negotiations between Primary and Quinn, and that ... full payment was made by [Primary]."
 
 
 22
 Id. at 124-25, 110 S.Ct. at 2765 (quoting ICC decision). The district court and the Eighth Circuit affirmed the ICC's determination. The Supreme Court reversed, holding that the ICC's refusal to permit the collection of the filed rate under these circumstances was contrary to the ICC's governing statute, which requires common carriers to collect only those rates that are published and filed. Id. at 130-35, 110 S.Ct. at 2768-70. However, the Supreme Court explicitly recognized that the ICA allows the ICC "to exempt motor contract carriers from the requirement that they adhere to the published tariff." Id. at 135, 110 S.Ct. at 2770-71 (citing 49 U.S.C. § 10761(b)).
 
 
 23
 Here, the Shippers are defending against the Trustee's undercharge actions on the ground that the Shippers and Transcon entered into valid contract carriage arrangements, thus exempting the Shippers from the obligation to pay the filed rates. Unlike the shipper in Maislin, who did not assert that the transport was contract carriage, the Shippers here present evidence of Transcon's contract carrier permit and written agreements for lower rates with specific indications of the Shippers' needs.
 
 
 24
 Moreover, the Trustee's standing is evidenced by the fact that other circuits and the Supreme Court have entertained appeals from persons or entities in the exact same position that the Trustee occupies in these cases. For example, in General Mills, the Bankruptcy Estate of United Shipping Co. appealed from a final judgment entered in the district court that affirmed the bankruptcy court's order awarding summary judgment for General Mills (a shipper) and giving effect to an ICC determination that the transportation relationship between United and General Mills constituted contract carriage. General Mills, 34 F.3d at 1387; see also Transrisk Corp. v. Matsushita Elec. Corp. of Am., 15 F.3d 313 (4th Cir.1994) (assignee of bankrupt carrier suing shipper for undercharges). Affirming, the Eighth Circuit held that the bankruptcy court and the district court correctly found that the ICC's decision that the carriage was contract, and not common, was not arbitrary or capricious or otherwise not in accordance with the law. General Mills, 34 F.3d at 1394.
 
 
 25
 In Reiter v. Cooper, the Supreme Court, in considering an undercharge suit, offered the following description of these actions:
 
 
 26
 A motor carrier negotiates with a shipper rates less than the tariff rates that the Interstate Commerce Act (ICA), 49 U.S.C. § 10701 et seq., requires the carrier to "publish and file" with the ICC, 49 U.S.C. § 10762. After the shipments are delivered and paid for (sometimes years after), the carrier goes bankrupt and its trustee in bankruptcy sues the shipper to recover the difference between the negotiated rates and the tariff rates.
 
 
 27
 507 U.S. 258, 260-61, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604; see also Maislin, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94.
 
 
 28
 Therefore, Kodak's challenge to the Trustee's standing fails.IV
 
 
 29
 Unlike common carriage, which involves services held out indiscriminately to all shippers, contract carriage is limited to shippers with which carriers enter into specific agreements or contracts. See generally General Mills, 34 F.3d at 1387-89. The ICA defined a contract carrier as a person providing motor carriage under "continuing agreements" by either assigning vehicles for the "exclusive use" of a shipper or providing services designed to meet that shipper's "distinct needs." 49 U.S.C. § 10102(16)(B)(i)-(ii).
 
 
 30
 During the time when the Agreements at issue here were in effect, ICC regulations defined "continuing agreements" as
 
 
 31
 special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments, and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.
 
 
 32
 49 C.F.R. § 1053.1 (1991) (repealed, effective June 20, 1992, in Contracts for Transportation of Property, 8 I.C.C.2d 520 (1992), appeal dismissed sub nom. Central States Motor Freight Bureau, Inc. v. United States, No. 92-1258, 1993 WL 558020 (D.C.Cir. Dec.28, 1993)).[7]
 
 
 33
 "Distinct needs" has been interpreted as "a need 'for a different or a more select or a more specialized service' than common carriage provides." Global Van Lines, Inc. v. ICC, 804 F.2d 1293, 1301 (D.C.Cir.1986) (quoting I.C.C. v. J-T Transp. Co., 368 U.S. 81, 91, 82 S.Ct. 204, 210, 7 L.Ed.2d 147 (1961)).
 
 
 34
 * To determine whether the motor transportation was contract or common carriage, the ICC examined the "totality of the circumstances" in each of these cases. See General Mills, 8 I.C.C.2d 313, 323 (1992) (applying "totality of circumstances" analysis), aff'd sub nom. Bankruptcy Estate of United Shipping Co. v. General Mills, 34 F.3d 1383 (8th Cir.1994). The ICC considered the parties' negotiations, intent, the Agreements themselves, and performance under the Agreements.[8]
 
 
 35
 In each case, the ICC found that (1) Transcon was an authorized contract carrier; (2) Transcon held itself out as a contract carrier and represented that it would provide services under its contract carrier authority; (3) Transcon entered into negotiations with, bid for, and won shipment routes from each Shipper; (4) Transcon and each Shipper entered into detailed written motor carrier contracts setting forth rates, specialized services to be provided by Transcon and, at least in one case, anticipated volumes; (5) each Shipper committed to tender an unspecified amount of freight to Transcon; (6) Transcon transported thousands of shipments for each Shipper; and (7) Transcon billed each Shipper and was paid for services rendered under the Agreements.
 
 
 36
 Based on these findings, the ICC concluded that Transcon and the Shippers met the "continuing agreements" and "distinct needs" requirements of 49 U.S.C. § 10102(16)(B). The ICC also specifically concluded that the Agreements were "bilateral and impose[d] specific obligations upon both carrier and shipper or shippers," as required by the then-applicable regulation outlined in 49 C.F.R. § 1053.1.
 
 
 37
 The ICC rejected the Trustee's contentions that the Agreements (1) did not specify "distinct needs" and (2) were not bilateral because they did not commit the Shippers to tender a certain volume of freight.
 
 
 38
 Noting the Supreme Court's observation that price could suffice as the distinct need required to establish contract carriage, J-T Transp. Co., 368 U.S. at 91-93, 82 S.Ct. at 210-12, the ICC concluded that each Agreement satisfied the "distinct needs" requirement by demonstrating not only the price need, but also additional needs specific to each Shipper.
 
 
 39
 The ICC also concluded that the Agreements were not required to contain specific minimum requirements for the tender of freight. Under the totality of the circumstances and according to its substantial compliance requirement, see General Mills, 8 I.C.C.2d at 321-23, the ICC concluded that the Agreements were "continuing" because the parties intended the Agreements to cover a continuing series of shipments and the parties' performance confirmed this intent. The ICC stated:
 
 
 40
 A flawlessly written contract is not an indispensable prerequisite to contract carriage conducted under the ICA. Thus, the fact that an agreement to provide authorized motor contract carriage may be incomplete or deficient in some respects does not change the status of the carriage from that intended by the parties at the time of transportation. Once a carrier with a contract carrier permit has agreed to provide contract carrier service to a shipper which is within the scope of service authorized by its permit, that carrier is legally obligated to provide that service.
 
 
 41
 The bankruptcy court upheld the ICC's determinations, finding that the ICC's conclusions were not plainly unreasonable and did not constitute arbitrariness or capriciousness. The district court, in turn, adopted the bankruptcy court's findings.
 
 B
 
 42
 On appeal, the Trustee challenges the ICC's decisions on several grounds. First and foremost, the Trustee argues that the Agreements are not bilateral and are not "continuing agreements" because the Agreements either disavow a commitment to tender specific freight, are silent on the issue, or contain token commitments to tender freight. In short, the Trustee maintains that contract carriage requires a bilateral contract that imposes on the shipper a duty to tender a specific amount of freight. The Trustee asserts that the determination of whether such a duty existed must be made based on the actual language of the Agreements themselves, without recourse to substantial performance or parol evidence of the parties' intent (both of which the ICC considered here). We are not persuaded.
 
 
 43
 We must defer to the ICC's statutory constructions unless those constructions are contrary to clear congressional intent or frustrate the policy that Congress sought to implement. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984); Dioxin/Organochlorine, 57 F.3d at 1525. We must defer to the ICC's interpretation of its own regulations, unless an alternative reading is compelled by the regulation's plain language or by other indications of the agency's intent at the time of the regulation's promulgation. Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 216 (9th Cir.1995).
 
 
 44
 We conclude that the Trustee fails to establish that the ICC's interpretations of its own statutes and regulations are unworthy of deference from this court. In terms of "distinct needs," which the statute does not define, there is more than enough evidence in the record to provide substantial support for the ICC's determinations that each Agreement provided for distinct needs of the Shippers. The Agreements clearly indicate that Transcon agreed to provide specific services as a contract carrier that a common carrier would be under no obligation to provide. See Global Van Lines, 804 F.2d at 1301 (interpreting "distinct needs" as need for different, more select, or more specialized service than common carriage provides) (citing J-T Transp., 368 U.S. at 91, 82 S.Ct. at 210). For example, some or all of the Agreements contained detailed price schedules, 30-days written-notice cancellation provisions, confidentiality clauses, commitments to ship unspecified amounts of freight, and anti-assignment provisions, in addition to more specific terms dealing with clean equipment needs (Kodak) or 100% on-time delivery requirements (IBM).
 
 
 45
 As for the ICC's interpretation of "continuing agreements",[9] we note that two other circuit courts have affirmed the ICC's substantial compliance/"totality of the circumstances" approach regarding "continuing agreements" in undercharge actions similar to the actions presented here. See General Mills, 34 F.3d 1383, 1393 (8th Cir.1994); Transrisk, 15 F.3d 313, 317 (4th Cir.1994). We see no reason not to follow our sister circuits' analysis on this issue.
 
 
 46
 In General Mills, the Eighth Circuit upheld the ICC's determination that an agreement that did not specifically require any shipments was a valid contract carriage arrangement (considering that the shipper in fact tendered more than 3,000 shipments to the carrier during the agreement). 34 F.3d at 1393-94. In Transrisk, even when a shipper expressly disavowed in the agreement any commitment to tender a minimum number of shipments, the Fourth Circuit deferred to the ICC's determination in General Mills and found that the bilateral requirement was met because hundreds of shipments (600) were actually tendered and the parties negotiated an "extensive, detailed schedule of rates." Transrisk, 15 F.3d at 317. But see id. at 318-19 (Luttig, J., dissenting) (rejecting ICC's new interpretation of contract carrier relationships that allows substantial performance to cure defects in contract terms; arguing that agreement is not bilateral because agreement does not on its face obligate shipper to transport any shipments with carrier).
 
 
 47
 Furthermore, as the Eighth Circuit stated in Trans-Allied Audit Co. v. ICC: "[W]e do not think the absence of specific terms which would be considered essential under contract law necessarily means that an agreement is not sufficient for purposes of determining compliance with the regulation." 33 F.3d 1024, 1032 (8th Cir.1994). The court concluded that the absence of freight specification in the contract did not mean that the arrangement was not bilateral; rather, the parties' relationship demonstrated bilateral obligations "sufficient to establish mutuality of commitment" for the purposes of the regulation. Id. at 1032.
 
 
 48
 In any case, actual performance can cure the lack of bilateral obligation in a written contract and demonstrate the parties' intent. See 17A Am.Jur.2d Contracts § 139 (1991); 3 Arthur Corbin, Corbin on Contracts § 558 (1960).
 
 C
 
 49
 The Trustee also argues that the ICC erred in considering parol evidence. This argument is without merit because, as a threshold matter, it is unclear whether the parol evidence rule even applies to the ICC when it is reviewing contracts to establish whether they comply with ICC regulations or statutes. See, e.g., General Mills, 34 F.3d at 1393 ("the absence of such terms [including volume of freight] could make the agreement deficient as a matter of contract law, but would not be controlling for purposes of determining compliance with the regulation"); Trans-Allied, 33 F.3d at 1032 ("what is at issue is not contract law but transportation law"). Even if the rule applies to the ICC in this role, the ICC did not violate the rule. The rule bars consideration of events that took place before, not after, the execution of the contract, see 3 Corbin § 573, and here the ICC principally relied on evidence concerning the parties' performance of the executed contract. In addition, the rule does not prohibit the use of evidence to clarify or to explain ambiguous terms (as the ICC did here); instead, the rule prohibits the use of parol evidence to vary or contradict the terms of an unambiguous contract. See 3 Corbin § 579.
 
 D
 
 50
 The Trustee further claims that the ICC, in certain cases, required an exact freight term in carriage contracts. In two cases relied upon by the Trustee, the ICC indeed mentioned in dicta that the "volume of freight involved" would be an essential term for contract carriage, but the ICC did not say that all carriage contracts must state the exact volume of freight to be shipped. See Diversey Wyandotte Corp., 1990 Fed. Carr. Cas. (CCH) p 37,821.01 (ICC June 4, 1990); MCI Telecommunications Corp. v. E.L. Murphy Trucking Co., 1989 Fed. Carr. Cas. (CCH) p 37,748.01 (ICC June 22, 1989). The comments on freight volume in Diversey and MCI are dicta because the issue of whether freight commitment was satisfied in a contract was not before the ICC, as it was here. Rather, in both decisions the ICC focused upon the "exclusive use" of vehicles and certain "distinct needs." Moreover, in General Mills, 8 I.C.C.2d at 322, the ICC clarified that although MCI and Diversey may have suggested that certain service terms are necessary in motor carrier contracts, such terms are, in fact, "not legally required."
 
 E
 
 51
 We next consider the Trustee's contention that the ICC decisions misrepresent one of the ICC's prior rulings (later modified) concerning freight volume in contract carriage. The bankruptcy court acknowledged this misrepresentation, but concluded that it was harmless.
 
 
 52
 The ICC cited Jacobs Extension--Frozen Foods, 96 M.C.C. 87, 92 (1964), for the proposition that ICC regulations "had never required that a numerical level of traffic tendered by the shipper be specified in the contract itself." The ICC omitted to mention that four months later, in an unpublished order, the ICC modified Jacobs by striking the quoted sentence concerning freight specificity and replacing it with a statement indicating that the contract was not bilateral. In the modified version of Jacobs, the ICC reversed its earlier position and declared that before the applicant could acquire permanent authority as a contract carrier he must comply with the requirements for contract carriage. This oversight by the ICC is hardly fatal.
 
 
 53
 Immediately after its cite to the language of the pre-modified Jacobs, the ICC added the following disclaimer: "[Even if our regulations had required a numerical level of freight to be specified in the contract], the parties performance under the agreement is sufficient to cure such a defect." In support of this notion, the ICC cited general contract law, which does not require recitation of consideration in contracts, and which considers the parties' course of performance. See 17A Am.Jur.2d, Contracts §§ 121, 139 (1991).
 
 
 54
 Since we may sustain an agency's decision as long as at least one of the grounds upon which the agency relies is valid, see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286-87, 95 S.Ct. 438, 442-43, 42 L.Ed.2d 447 (1974),[10] and since actual performance and general contract law cure any defects that may be present in the Agreements, the ICC's misstatement concerning Jacobs is not of great consequence.
 
 F
 
 55
 Finally, the Trustee contends that the ICC's substantial compliance policy is an attempt to engineer an end-run around the filed rate doctrine, to prevent bankrupt carriers from recovering undercharges based on sham agreements for contract carriage. This contention lacks merit.
 
 
 56
 Even though the ICC's determinations prevented the Trustee from recovering the filed rate for shipments that he alleges were not in contract carriage, this by no means infringes upon the filed rate doctrine. Like the ICC's filed rate requirements, the ICC's contract carrier requirements are codified and regulated. In fact, the contract carrier requirements, when met, give rise to an exception from the requirements of the filed rate doctrine. The interplay between the two sets of requirements inevitably led to the need for the ICC to harmonize and to reconcile conflicts that may develop between them. As the Supreme Court has recognized, the filed rate doctrine is very important, but it does not bar the ICC from enforcing other statutory or regulatory provisions that necessarily interact with, or even conflict with, the filed rate doctrine. See, e.g., ICC v. Transcon Lines, --- U.S. ----, ----, 115 S.Ct. 689, 695, 130 L.Ed.2d 562 (1995) (filed rate doctrine does not bar ICC from "requiring departure from a filed rate when necessary to enforce other specific and valid regulations [such as the ICC's credit regulations]"); Reiter, 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (filed rate doctrine does not bar shipper claims for damages based on unreasonable rates).
 
 
 57
 The evidence here persuasively demonstrates that the parties intended to engage, and actually did engage, in continuous shipping arrangements involving the satisfaction of distinct needs on the part of Shippers. Unlike other undercharge cases (ones not involving contract carriage), where Shippers who should have paid the filed rate made secret oral agreements with carriers to pay a reduced special discount, here there is no clear evidence that these contracts were a sham designed to avoid the requirements of the filed rate doctrine. Transcon had a valid contract carrier permit and written Agreements with detailed accounts of needs and expectations.
 
 
 58
 In short, the Agreements between Transcon and the Shippers gave rise to contract carriage which the ICC exempted from the requirements of the filed rate doctrine. Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150 (1983), aff'd sub nom. Central & S. Motor Freight Tariff Ass'n v. United States, 757 F.2d 301 (D.C.Cir.), cert. denied, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985); see Maislin, 497 U.S. at 134-36, 110 S.Ct. at 2770-71 (citing 49 U.S.C. § 10761(b)).
 
 V
 
 59
 The ICC decisions, adopted by both the bankruptcy court and the district court, are supported by substantial evidence and are neither arbitrary, nor capricious, nor contrary to law. Accordingly, we affirm the district court's summary judgments in favor of each of the six Shippers.
 
 
 60
 AFFIRMED.
 
 
 
 [1]
 Pursuant to the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), Pub.L. No. 104-88, 109 Stat. 803, the Surface Transportation Board ("STB") has been substituted in these actions for the Interstate Commerce Commission ("ICC"), which the ICCTA abolished effective January 1, 1996. ICCTA §§ 201, 204(c)(2). The ICCTA vests the STB with jurisdiction over these actions. 49 U.S.C. § 13710(b)
 
 
 [2]
 Although the ICC has been abolished and replaced by the STB, we refer to the ICC throughout this opinion with the understanding that the STB has inherited the ICC's jurisdiction over these actions
 
 
 [3]
 See Bankruptcy Estate of United Shipping Company v. General Mills, Inc., 34 F.3d 1383, 1391 (8th Cir.1994) (citing Atlantis Express, Inc. v. Standard Transp. Servs., Inc., 955 F.2d 529, 532-34 (8th Cir.1992))
 
 
 [4]
 See ACF Indus., Inc., 1993 Fed. Carr. Cas. (CCH) p 38,091 (ICC Oct. 20, 1993); American Standard, Inc., 1993 Fed. Carr. Cas. (CCH) p 38,074 (ICC Oct. 12, 1993); A.O. Smith Corp., 1993 Fed. Carr. Cas. (CCH) p 38,075 (ICC Oct. 12, 1993); AT & T Technologies, Inc., 1993 Fed. Carr. Cas. (CCH) p 28,076 (ICC Oct. 13, 1993); Eastman Kodak Company, d/b/a Texas Eastman Company, 1993 Fed. Carr. Cas. (CCH) p 38,077 (ICC Oct. 12, 1993); International Business Machines Corp., 1993 Fed. Carr. Cas. (CCH) p 38,081 (ICC Oct. 12, 1993)
 
 
 [5]
 The Supreme Court granted the ICC's petition for certiorari on an aspect of the Ninth Circuit's opinion that did not deal with the standing question discussed here. The Supreme Court addressed whether Transcon's violations of the ICC's credit regulations enabled the ICC to enjoin the Trustee from collecting liquidated damages from Shippers who failed to make timely payments. Transcon Lines, 990 F.2d 1503 (9th Cir.1992), vacated in part and remanded, 508 U.S. 969, 113 S.Ct. 2955, 125 L.Ed.2d 657 (1993)
 
 
 [6]
 As this court explained: "Transcon had on file with the ICC the bureau rate setting out its full charges; its discount rate; and the rules tariff providing that the discounts applied to charges that were paid within 90 days of the date of shipment. Together these filings constituted Transcon's filed rate." Transcon Lines, 990 F.2d at 1513 (emphasis added)
 
 
 [7]
 The regulations were reinstated by the Negotiated Rates Act of 1993, Pub.L. No. 103-180, 107 Stat.2044 (codified as amended at 49 U.S.C.A. § 10701 (West Supp.1994) (effective Dec. 3, 1993))
 
 
 [8]
 The ICC had primary jurisdiction to interpret provisions of the statute that it administered (here, 49 U.S.C. § 10102(15)), Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), and to determine the permissible scope and manner of operations conducted under certificates and permits issued by the ICC, Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959)
 
 
 [9]
 "Continuing agreement" is not defined by statute, but is defined in part by the ICC's repealed regulation, 49 C.F.R. § 1053.1, which is applicable to the Agreements here
 
 
 [10]
 See also Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C.Cir.1989), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990)